**FLEET WHOLESALE SUPPLY COMPANY, INC., Plaintiff–Appellant,**

v.

**REMINGTON ARMS COMPANY, INC., Defendant–Appellee.**

**No. 87–2862.**

United States Court of Appeals, Seventh Circuit.

Argued April 18, 1988.

Decided May 6, 1988.

Michael A. Bowen, Foley & Lardner, Milwaukee, Wis., for plaintiff-appellant.

Diane Sykes, Whyte & Hirschboeck, S.C., Milwaukee, Wis., for defendant-appellee.

Before CUMMINGS, CUDAHY and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

The Wisconsin Fair Dealership Law, Wis. Stat. ch. 135, governs the relations between a supplier and its "dealers" but does not define "dealer" except by saying that a dealer is a distributor in a "community of interest" with the supplier, § 135.02(2), (3), which just pushes the lack of a definition to a new level of abstraction. *Ziegler Co. v. Rexnord, Inc.*, 139 Wis.2d 593, 407 N.W.2d 873 (1987), adopts a multi-factor definition under which the trier of fact must ponder all aspects of the buyer-seller relation.

This case, removed to federal court under the diversity jurisdiction, pits Fleet Wholesale Supply Co., which operates 25 retail outlets in Wisconsin, against Remington Arms Co., which supplied Fleet with about $1.6 million of firearms in 1986. Sales of Remington's guns accounted for about 0.5% of Fleet's revenues in 1986. Fleet did not have an exclusive territory but operated under an agreement designating it as a distributor with annual sales targets, and it built a special facility to store weapons it purchased from Remington; in exchange Remington gave Fleet a "functional distributor discount" of 5% relative to the prices charged to many other customers. The legality of such a discount to a large "dual distributor" (a firm with both wholesale and retail operations) was called into question by *Boise Cascade Corp.*, 107 F.T.C. 76 (1986), which interpreted the Robinson–Patman Act, 15 U.S.C. § 13, to prohibit such "functional discounts" in almost every case, even when the industry was vigorously competitive. Whether out of concern for liability or out of a belief that a different method of pricing would increase profits, Remington told its distributors in late 1986 that they were terminated, and then promptly told them that they were welcome to continue to purchase on different terms. In Fleet's case, that meant the elimination of the 5% "functional distributor discount". (It may also have meant the elimination of deferred payment terms, a disputed but unimportant issue.)

Fleet, claiming to be a "dealer" protected by Wisconsin's statute against terminations without adequate reason, filed this suit seeking an injunction against its "termination". Remington replied that it had not terminated Fleet but had simply increased its price, something both state law and the contract between the parties permit; Remington added that Fleet's sales were such a small portion of its business that it was not a "dealer" and, if it were, damages would be an adequate remedy for any injury. Fleet rejoined that the price increase was selective, that other wholesalers (and at least one dual distributor) continue to receive the 5% discount, making the change an imposition of onerous terms forbidden as the practical equivalent of termination. See Wis.Stat. § 135.03 (prohibiting substantial changes without good cause); *Remus v. Amoco Oil Co.*, 794 F.2d 1238, 1240 (7th Cir.1986). It also relied on Wis.Stat. § 135.065, which says that any violation of the Act "is deemed an irreparable injury to

the dealer for determining if a temporary injunction should be issued."

The district court thought this "deemer" clause counter-intuitive and declined to issue an interlocutory injunction on two grounds: that Fleet has an "adequate remedy at law" (damages) even if it will suffer irreparable injury; and that Fleet is likely to lose the case on the merits because purchases amounting to 0.5% of its retail sales did not make Fleet a "dealer". Fleet took this immediate appeal under 28 U.S.C. § 1292(a)(1). It has meanwhile pursued discovery in the district court and amended its complaint to assert that selective elimination of the 5% discount violates the Robinson–Patman Act; in another forum, the FTC has been told that its views of the application of that statute to dual distributors are erroneous. *Boise Cascade Corp. v. FTC*, 837 F.2d 1127 (D.C.Cir.1988). Whether Remington will revamp its pricing structure yet again we cannot say. We are concerned on this appeal only with the application of the Fair Dealership Law to the denial of the preliminary injunction.

Someone protesting the denial of a preliminary injunction has an uphill task, for the district court has substantial discretion both in estimating the probability of success on the merits and in balancing the equitable aspects of the claim. When the district court has such discretion, review is deferential. See *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429 (7th Cir.1986); *American Hospital Supply Corp. v. Hospital Products Ltd.*, 780 F.2d 589 (7th Cir. 1986); *Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380 (7th Cir.1984). The court should try to minimize the error costs, the sum of the costs of erroneously granting an injunction (should it turn out that none is warranted) and of denying an injunction (should the plaintiff prevail in the end). To minimize the costs of the two possible errors, the court must know (and compare) the costs of granting and denying relief. That inquiry requires the court to consider many factors that cannot be measured precisely, hence the deferential review. The district court did not abuse its discretion in this case. It thought the prob-

ability of Fleet's prevailing on the merits small; we agree. Only a "dealer" is protected by the Act—and then only against unjustified termination. Purchases from Remington made up only 0.5% of Fleet's business. No court has held that a firm doing such a small portion of its business with one supplier is a "dealer". And the weakness on the merits, combined with the fact that the case entails only a 5% price increase on 0.5% of Fleet's business, suggests that the potential costs of an erroneous denial of interim relief are small.

The Wisconsin Act was designed to regulate the franchise relation, on the premise that the franchisor has the franchisee over a barrel after their business dealings begin. The franchisor (supplier) may be able to change the terms for the worse after the franchisee (dealer) has invested much of its capital in firm-specific promotion, training, design, and other features. Once the dealer is locked into the supplier, the supplier may seek to extract what an economist would call a quasi-rent. One can doubt the premise of the statute: the supplier's concern for its reputation would dissuade it from doing this if it planned to add outlets, and competition among firms may keep in line even franchisors that no longer want to line up new outlets. They cannot effectively raise their dealers' costs of business without diverting customers to other, cheaper sources of goods. Nonetheless, a state is entitled to conclude, as Wisconsin has, that exploitation by franchisors is a serious problem. This understanding of the purpose of the statute, though, suggests its limits. Firms buying a small portion of their needs from a single supplier can more readily turn to other sources (as Fleet has turned to other sources of firearms) or absorb the loss (as by substituting fishing for hunting gear), and suppliers correspondingly have little ability to extract concessions; competition prevents it. The smaller the portion of sales from a single source, the less (ex post) market power the supplier possesses. See generally *Moore v. Tandy Corp.*, 819 F.2d 820, 822–24 (7th Cir.1987) (discussing the purposes and limits of the Act).

One can be a franchisee or statutory "dealer" without buying 100% of one's stock from a single supplier—a service station selling only Exxon's gasoline might sell soft drinks, tires, and other items from other sources. Many cases drew the line between "dealer" and ordinary purchaser at 50% of the buyer's business. See Note, *Foerster, Inc. v. Atlas Metal Parts—The Wisconsin Supreme Court Takes a Narrow View of the Dealer's Financial Interest Protected by the Wisconsin Fair Dealership Law,* 1985 Wis.L.Rev. 155, 179 n. 127 (1985) (collecting cases). *Ziegler* requires a different approach, calling for the consideration of multiple factors and implying that 8% of sales (the amount in *Ziegler* itself) could be enough if other factors suggested "dealership". Cf. *Reinders Brothers, Inc. v. Rain Bird Eastern Sales Corp.,* 627 F.2d 44, 47 (7th Cir.1980) (a case involving 4% of sales). But the court added in *Ziegler* that a low percentage of sales is "strong evidence, evidence that might ultimately be determinative in many cases, that there is no continuing financial interest between the parties in the operation of the business and thus no community of interest", 139 Wis.2d at 607, 407 N.W.2d at 880—and thus, under the Act, no "dealership". The district court was entitled to conclude that 0.5% of sales—an order of magnitude smaller than the least found to satisfy the Act to date—is unlikely to be covered.

Although Fleet protests that the district court erred in looking solely to the volume of sales and disregarding the other criteria mentioned in *Ziegler,* it did look at some. It mentioned, for example, the fact that Fleet does not service Remington's products, which cuts against a finding of dealership. At all events, the small percentage of Fleet's sales accounted for by Remington's products dominates the case. The inquiry when a party seeks a preliminary injunction may be cursory compared with the full analysis required before final judgment, and the court is entitled to examine (and rely on) what appear to be the most important features of the case. The other factors mentioned in *Ziegler,* such as whether the contract establishes an exclusive territory, do not all weigh in favor of Fleet; indeed that one, and some others, militate against a finding that Fleet is a "dealer".

The conclusion that the district court was entitled to find that Fleet is unlikely to prevail on the merits makes it unnecessary to pursue at length that court's conclusion that "irreparable injury" and "inadequate remedy at law" are different—that a party may have an adequate remedy (and so not be entitled to an injunction) even if he is suffering irreparable injury. Fleet argues with some force that although remedies could be inadequate (in fact) without the injury being irreparable (in principle), a conclusion that the injury is irreparable necessarily shows that there is no adequate remedy at law. Cf. *Roland,* 749 F.2d at 383. To say that the injury is *ir*reparable means that the methods of repair (remedies at law) are inadequate. We therefore doubt that a district court may undercut the presumption of irreparable injury—which is how both parties treat the "deemer" clause of § 136.065—by treating the adequacy of remedies at law as a wholly separate topic. No matter. The district court need not treat a presumption as conclusive when the "termination" is (as that court found) no more than a 5% increase in price. Computation of the damage inflicted by a price increase is a staple of the legal system. Fleet insists that its reputation will suffer if it does not offer Remington arms, but of course it can; it only has to pay the 5% price. If it chooses not to do so, the court may properly infer that the reputational injury is less than 5% of the selling price of the goods. The improbability of Fleet's prevailing on the merits, added to the fact that it has not been cut off, sealed the fate of its request for a preliminary injunction.

AFFIRMED.