**WRIGHT–MOORE CORPORATION,**
Plaintiff–Appellant, Cross–Appellee,

v.

**RICOH CORPORATION,**
Defendant–Appellee,
Cross–Appellant.

Nos. 89–2784, 89–2854.

United States Court of Appeals,
Seventh Circuit.

Argued April 9, 1990.

Decided July 16, 1990.

As Amended July 30, 1990.

As Amended on Denial of Rehearing and
Rehearing En Banc Aug. 28, 1990.

Wayne, Ind., for plaintiff-appellant, cross-appellee.

James P. Fenton, Robert S. Walters, Barrett & McNagny, Fort Wayne, Ind., for defendant-appellee, cross-appellant.

Before BAUER, Chief Judge, and FLAUM and RIPPLE, Circuit Judges.

FLAUM, Circuit Judge.

This case arises out of defendant Ricoh Corporation's ("Ricoh") refusal to renew its national distributorship agreement with plaintiff Wright–Moore Corporation ("Wright–Moore") after the expiration of its one year term. On a motion for summary judgment, the district court, applying Indiana law, held that Ricoh had good cause not to renew Wright–Moore's franchise agreement and did so without bad faith or discrimination, in compliance with the Indiana franchise statutes. *See* IND. CODE §§ 23–2–2.5–1, *et seq.*, 23–2–2.7–1, *et seq.* The court further held that Ricoh did not breach its contract with Wright–Moore and did not engage in fraud or misrepresentation with respect to the contract. Finally, the court refused to estop Ricoh from not renewing Wright–Moore based on oral representations made prior to the formation of the contract. Wright–Moore appeals the grant of summary judgment and Ricoh cross-appeals claiming that, in the event we hold for Wright–Moore, venue was improper. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I.

Wright–Moore is an Indiana corporation having its principal place of business in Fort Wayne, Indiana. It is an independent distributor of copiers, related parts, and supplies. Wright–Moore has developed a network of independent, authorized dealers to purchase and resell its products which it supports by providing service training for the products they handle and offering the independent dealers favorable credit terms and minimal inventory requirements. Ricoh is a New York corporation with its principal place of business in West Cald-

Philip A. Whistler, Cory Brundage, Fred R. Biesecker, Ice, Miller, Donadio & Ryan, Indianapolis, Ind., Vincent J. Backs, Beers, Mallers, Backs, Salin & Larmore, Fort

well, New Jersey. It manufactures copiers, related parts and supplies, and distributes them both through independent distributors (such as Wright–Moore) and its own network of retail dealers.

In early 1984, the parties entered into a one year agreement whereby Wright–Moore agreed to distribute Ricoh 3000 Series copiers. In July, 1984, the parties entered into a second (and superceding) one year agreement under which Wright–Moore was appointed a national distributor of both the Series 3000 and the Series 4000 Ricoh copiers. Under the agreement, Wright–Moore was required to purchase 2,850 copiers during the one year contract term and to bear the costs of providing Ricoh-prescribed training courses for the service personnel of each dealer to whom Wright–Moore sold a Series 4000 machine. To meet this requirement, Wright–Moore, at its own cost, sent employees to Ricoh's headquarters for training and these employees, in turn, trained the service personnel of each dealer. The agreement also required Wright–Moore to maintain an extensive inventory of copier parts.

According to the agreement, the sole relationship between the parties was that of supplier and distributor. Wright–Moore's territory was defined as the continental United States, and Wright–Moore was permitted to sell as a wholesaler to retailers not affiliated with Ricoh. Wright–Moore was forbidden from using any Ricoh trademark in connection with Wright–Moore's name but was permitted to state that it was authorized to distribute certain Ricoh products. The agreement provided that the courts of Manhattan would have exclusive jurisdiction over any controversy arising out of the agreement and that New York law would govern any disputes. The agreement also contained an integration clause nullifying all prior agreements and understandings.

A second, related agreement, styled a "letter agreement," was completed simultaneously with the distributorship agreement. Wright–Moore agreed in the letter agreement to purchase immediately 1,200 machines towards the 2,850 requirement. The letter agreement also provided Wright–Moore with "price protection" in the event of a price change and allowed Wright–Moore to purchase more copiers on the same credit terms as the 1,200 machines provided for in the letter agreement.

Wright–Moore performed up to Ricoh's expectations during the contract term. At the end of the term, however, Ricoh refused to renew the distributorship and Wright–Moore filed this suit against Ricoh in the Northern District of Indiana. It claimed violations of the Sherman Act and the Indiana franchise statutes, breach of contract, fraud, misrepresentation and estoppel and sought compensatory and punitive damages. Wright–Moore claimed that it had been assured by Ricoh that its relationship with Ricoh would be long term and that under Ricoh policy, Wright–Moore's national distributorship would be renewed as long as it satisfied its financial obligations to Ricoh and met its minimum purchase agreements. Wright–Moore contended that the continued success of its dealers caused dealers in Ricoh's own network to complain that its aggressive pricing policy cut into their profits. As a result, Ricoh and its authorized dealers conspired against it, culminating in Ricoh's refusal to perform its obligations under the letter agreement (specifically, Ricoh changed the credit terms and did not give it price protection) and refusal to renew the distributorship agreement as contemplated by the parties.

As a defense, Ricoh offered evidence that the refusal to renew was based on a change in marketing strategy. In early 1985, James Ivy, Ricoh's new vice-president for sales and marketing, undertook a review of Ricoh's distribution system to determine whether the existing distribution network was appropriate for the effective marketing of Ricoh's copiers. At that time, Wright–Moore, together with three other independent dealers, served as national distributors of the Ricoh 3000 and 4000 Series copier. These machines were also marketed through regional distributors and through Ricoh's own dealer network. The overlap of responsibility between the national and regional distributor-

ships along with the resulting competition prevented the development of strong regional distributors which Ivy believed could best market the products. Ivy, therefore, decided that Wright–Moore and the other national distributorship agreements should not be renewed. In January of 1985, a meeting was held between Ricoh and Wright–Moore at which Wright–Moore was informed that Ricoh was considering removing the 3000 and 4000 Series copiers from national distribution. Ricoh discussed with Wright–Moore several alternatives, including regional distributorships of the 3000 and 4000 Series copiers or a national distributorship for two other copier models, but no agreement was reached.

Based on this evidence, Ricoh moved for summary judgment. The district court determined that there was no evidence of a conspiracy in violation of the Sherman Act. With respect to the Indiana franchise statutes, the court held that the choice of law clause in the contract was contrary to Indiana public policy as stated in the franchise statutes and, therefore, it would apply Indiana law rather than New York law. It further held that there was a material issue of fact with respect to Wright–Moore's qualification as an Indiana franchise. It found, however, that the evidence established that Ricoh was motivated by its economic self-interest and did not act in bad faith or with discriminatory purpose. Economic self-interest, the court held, was sufficient to satisfy the good cause requirement of the Indiana franchise statutes.

With respect to the breach of contract claims, the court determined that, on its face, the letter agreement's credit terms for future orders of copiers might have been breached but that properly interpreted in conjunction with the distributorship agreement, it was, in fact, not breached because the distributorship agreement allowed Ricoh to unilaterally change terms of credit. The court further determined that the price protection clause of the letter agreement had not been breached because it only provided price protection if Ricoh were to offer a lower price to another distributor, a condition precedent which had not occurred.

The court also found no fraud or misrepresentation because Ricoh had made statements only with respect to its future actions and Indiana law expressly prohibits fraud or misrepresentation claims based on representations of future actions. The court held that the same was true for the Indiana franchise statute's fraud provision. Finally, the court held that Ricoh is not estopped from not renewing the contract because Wright–Moore could not reasonably rely on Ricoh's oral representations made prior to formation of the contract. The court, therefore, granted Ricoh summary judgment. The court expressly refrained from reaching the forum selection clause of the distributorship agreement.

Wright–Moore appeals claiming that there were material issues of fact with respect to the franchise, contract, fraud and misrepresentation claims. In addition, Wright–Moore maintains that the district court made errors of law. Specifically, Wright–Moore claims that: (1) under Indiana franchise law, economic self-interest is not good cause for nonrenewal of a contract; (2) the court misinterpreted the letter agreement by reading it in conjunction with the distributorship agreement; and (3) the court's reading of the agreement was in violation of Indiana franchise law. Wright–Moore has abandoned the Sherman Act counts on appeal. Ricoh cross-appeals, arguing that, in the event that we hold for Wright–Moore, the forum selection clause requires a change in venue.

II.

A. *Indiana Franchise Law Claims*

Wright–Moore's appeal raises several significant issues under the Indiana franchise laws. IND.CODE §§ 23–2–2.5–1, *et seq.*, 23–2–2.7–1, *et seq.* Wright–Moore argues that the district court erred as a matter of law in holding that non-renewal for the economic purposes of the franchisor consitutes good cause under IND.CODE § 23–2–2.7–1(7). In addition, Wright–Moore claims that summary judgment was improper because there were material issues of fact with respect to Ricoh's good

faith during termination and with respect to the claim of discrimination. Ricoh supports the district court's holding but argues in the alternative that the contractually chosen New York law applies rather than Indiana law and, in addition, that Wright–Moore was not a franchise.

### 1. Choice of Law

We begin with the choice of law question. Wright–Moore claims Indiana franchise law applies, despite the choice of New York law in the agreement, on the ground that the Indiana franchise statutes prohibit waiver of its protections and prohibit "limiting litigation brought for breach of the [franchise] agreement in any manner whatsoever." IND.CODE § 23–2–2.7–1(10). Ricoh argues that the express choice of law provision of the contract should govern. The district court held that Indiana has articulated a strong public policy against allowing parties to contract out of the protections of its franchise law and that this public policy overrides the choice of law provided for in the agreement.

Indiana has long adhered to the "most intimate contacts" test for choice of law. *W.H. Barber v. Hughes*, 223 Ind. 570, 63 N.E.2d 417 (1945). This approach has since been elaborated in the Restatement (Second) Conflict of Laws § 188 (the "Restatement"). *See Utopia Coach Corp. v. Weatherwax*, 177 Ind.App. 321, 325, 379 N.E.2d 518, 522 (1978) (the Restatement approximates Indiana law). Under this approach, "the court will consider all acts of the parties touching the transaction in relation to the several states involved and will apply as the law governing the transaction the law of that state with which the facts are in most intimate contact." *W.H. Barber*, 63 N.E.2d at 423. This approach also recognizes that parties may expressly choose the applicable law through a contract. "The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." Restatement § 187(1). Typical issues that cannot be determined by explicit agreement

include capacity, formalities, substantial validity, and illegality, but the set issues which cannot be contractually chosen is determined by local law. *Id.* at comment d. If the issue is one which could not have been explicitly resolved by the contract, the choice of law provisions of the contract will still apply unless the "chosen state has no substantial interest" in the litigation or "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of applicable law in the absence of an effective choice of law by the parties." *Id.* at § 187(2).

We agree with the district court that enforcement of the choice of law provision in the distributorship agreement would be contrary to Indiana's express public policy. Indiana has made it unlawful to enter into a franchise agreement "requiring the franchisee to prospectively assent to a release ... [or] waiver ... which purports to relieve any person from liability to be imposed by this chapter" or to enter into an agreement "limiting litigation brought for breach of the agreement in any manner whatsoever." IND.CODE § 23–2–2.7–1(10). We owe deference to the district judge's interpretation of the law of the state in which the judge sits, *see, e.g., Moore v. Tandy Corp.*, 819 F.2d 820, 823 (7th Cir. 1987), and the district judge here found that these provisions articulated a strong state policy against allowing contractual choice of law provisions to control the applicability of these provisions to Indiana franchises. The public policy, articulated in the nonwaiver provisions of the statute is clear: a franchisor, through its superior bargaining power, should not be permitted to force the franchisee to waive the legislatively provided protections, whether directly through waiver provisions or indirectly through choice of law. This public policy is sufficient to render the choice to opt out of Indiana's franchise law one that cannot be made by agreement.

Indiana law, following the Restatement, however, permits state public policy to override the contractual choice of law

only if the state has a materially greater interest in the litigation than the contractually chosen state. Thus, for the Indiana public policy to control the choice of law, Indiana must have a materially greater interest in the litigation than does New York. We conclude that this is the case here. Wright–Moore is potentially a franchisee and is incorporated and located in the state of Indiana; its witnesses and documents are there; the contract negotiations occurred there; and the contract was, in part, performed there. New York's only connection to this litigation is that the defendant is incorporated in New York. The defendant's principal place of business is New Jersey. Indiana, therefore, has a materially greater interest in the litigation than New York. Since Indiana has a materially greater interest than New York and application of New York law would be contrary to a fundamental Indiana policy, Indiana franchise law governs this case.[1]

Ricoh offers *Modern Computer Systems, Inc. v. Modern Banking Systems, Inc.*, 871 F.2d 734 (8th Cir.1989) (en banc), for the proposition that the contractual choice of law should apply in this case. In *Modern Computer*, the Eighth Circuit held that Minnesota franchise law did not override the choice of law provision in the parties' contract. The court, relying on a Sixth Circuit case, *Tele–Save Merchandising Co. v. Consumers Distribution Co.*, 814 F.2d 1120 (6th Cir.1987), gave four reasons for its decision: the parties had agreed to the choice of law in the contract; the contacts between the forum and the competing states were evenly divided; the parties were not of unequal bargaining power; and the application of the law chosen in the contract was not against Minnesota's public policy. *Modern Computer*, 871 F.2d at 738–39. The court noted that Minnesota's strong public policy in favor of recognition of contractual choice of law outweighed Minnesota's policy against waiver of its franchise law's provisions. Minnesota has, however, legislatively overruled *Modern Computer*. The statute now reads "any condition, stipulation or provision, *including any choice of law provision*, purporting to bind any person ... is void." Minn.Stat. § 80C.21 (emphasis added).

Insofar as the case remains a valid interpretation of Minnesota law prior to these changes in the statute (a questionable assumption given the immediacy of the changes after the case), Ricoh argues that its logic still applies here. We are not convinced, however, that Indiana would apply the *Modern Computer* analysis to determine its choice of law, at least insofar as it conflicts with the "most intimate contacts" test. Even under such an analysis,

---

1. No Indiana court has applied a contractual choice of law provision to an entity that would, under Indiana law, qualify as a franchise. Two federal district courts (other than the district court in this case), sitting in diversity, have considered the issue. In *Sheldon v. Munford, Inc.*, 660 F.Supp. 130 (N.D.Ind.1987), the court held that the contractual choice of Georgia law controlled because Indiana did not have a public policy against the contractual provisions at issue, namely exclusive territory and noncompetitor-franchisor clauses and, therefore,. these issues were issues where the choice of law could be chosen by contract. Unlike *Sheldon*, the provisions of the contract at issue here are potentially in violation of Indiana public policy; renewal without good cause violates IND.CODE § 23–2–2.7–1(7) which requires good cause for termination of a franchise, and a unilateral change of credit terms violates IND.CODE § 23–2–2.7–2(2).

In *Sullivan v. Savin Business Machines, Corp.*, 560 F.Supp. 938 (N.D.Ind.1983), the plaintiff alleged that the agreement was an adhesion contract and, therefore, the choice of law provisions were void. The court held that the parties were of equal bargaining power so the agreement was not an adhesion contract and consequently it applied the contractual choice of law. *Sullivan* is not apposite because the plaintiff in that case did not claim that the contract was in violation of Indiana public policy but rather claimed that the contract was an adhesion contract. While the contract in the present case is most likely not an adhesion contract (this issue is not before us), other Indiana public policies not considered in *Sullivan*, such as those concerning unilateral termination of contracts, are at issue here. Consequently, neither of these cases provide influential precedent on the issue before us.

*South Bend Consumer's Club v. United Consumer's Club*, 572 F.Supp. 209, 214 (N.D.Ind. 1983) is closer to the case at hand. In *South Bend Consumer's Club* the district court applied Indiana law despite a contractual choice of Illinois law because Indiana had a public policy against restrictive covenants. The court held that, as evidenced by Indiana statutes, the policy of Indiana was opposed to the enforcement of the covenant at issue and therefore, the parties could not contractually choose Illinois law.

Indiana and not New York law would apply. The strength of nonwaiver provisions among states varies. For example, Wisconsin does not permit parties to avoid the effects of its franchise law through contractual choice of law provisions; Wisconsin law governs all Wisconsin franchises. *See Bush v. National School Studios, Inc.,* 139 Wis.2d 635, 407 N.W.2d 883, 886 (1987). Wisconsin bases this decision on the belief that most franchisors are more powerful than franchisees, and for the law to have any impact, the parties must not be able to contract out of its protections. *See* Wis. Stat. § 135.025(3). Minnesota has now followed Wisconsin by explicitly amending its statute. Indiana has also articulated a strong public policy with respect to contractual waiver of actions under its franchise law. Indiana has made it unlawful to require the franchisee to enter into an agreement "limiting litigation brought for breach of the agreement *in any manner whatsoever.*" IND.CODE § 23–2–2.7–1(10) (emphasis added). Indiana has also made it unlawful for a franchise agreement to "requir[e] the franchisee to prospectively assent to a release, ... waiver, or estoppel which purports to relieve any person from liability to be imposed by this chapter." *Id.* at 1(5). We believe that these statements evince a legislative policy against waiver of Indiana franchise law through choice of law provisions and, therefore, we are not convinced that *Modern Computer* applies to Indiana.[2]

### 2. *Wright–Moore's Qualifications as a Franchisee*

■ Ricoh argues that Wright–Moore is not a franchisee and, therefore, Indiana

franchise law does not apply. To qualify as a franchisee under Indiana law, three requirements must be satisfied: (1) the franchisee must be granted the right to engage in the business of dispensing goods or services under a marketing plan; (2) under the marketing plan, the franchisee must be substantially associated with the franchisor's trademark; and (3) the franchisee must pay a franchise fee.[3] IND.CODE § 23–2–2.5–1(a). The district court held that there were sufficient issues of material fact under these elements to preclude summary judgment on Wright–Moore's fulfillment of these requirements.

Ricoh vigorously contests this conclusion. Primarily, it argues that Wright–Moore does not intuitively match the type of entity the Indiana legislature envisioned when writing the statute. Invoking the image of a "mom and pop" franchisee, Ricoh maintains that Wright–Moore was instead a national wholesale distributor of equal bargaining power to Ricoh and therefore bears none of the "hallmarks" of a franchisee. While this argument has some appeal, it is up to the Indiana legislature to decide what the "hallmarks" of a franchisee are and it has done so through its three statutory requirements. Ricoh's arguments are best addressed to these requirements and we address each element in turn.

With respect to the right to dispense goods, Ricoh argues that there is no evidence that Wright–Moore was constrained by a marketing plan. In *Master Abrasives*

---

**2.** Application of Indiana franchise law to control who sells copiers in other states may present difficulties under the commerce clause. See *Healy v. Beer Institute, Inc.,* —— U.S. ——, 109 S.Ct. 2491, 2497, 105 L.Ed.2d 275 (1989) ("the 'Commerce Clause ... precludes the application of a state statute to commerce that takes place wholly *outside* of the State's borders, whether or not the commerce has effects within the State.' ") (citations omitted). It may be the case the Wright–Moore's incorporation and principal place of business in Indiana give Indiana sufficient connection to all products sold by Wright–Moore to apply its own law. The import of the commerce clause on the application of Indiana law, however, was not considered by the district court and was not fully briefed here. Consequently, we reserve this is-

sue for another day when it is more squarely presented.

**3.** Specifically § 23–2–2.5–1(a) provides that a " 'franchise' means a contract by which:

(1) a franchisee is granted the right to engage in the business of dispensing goods or services, under a marketing plan or system prescribed in substantial part by a franchisor;
(2) the operation of the franchisee's business pursuant to such a plan is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate; and
(3) the person granted the right to engage in this business is required to pay a franchise fee."

*Corp. v. Williams*, 469 N.E.2d 1196, 1200 (Ind.App.1984), the Indiana Court of Appeals held that a marketing plan existed where the agreement allowed the franchisor to prescribe sales territories and sales quotas, approve sales personnel, and establish mandatory training. Our review of the record indicates that there is evidence that these elements are present here: Wright–Moore had a quota of copiers to sell; its territory was national; and Ricoh required personnel to go through mandatory training before allowing them to sell copiers. This is sufficient under *Master Abrasives* to establish a marketing plan.

Ricoh also contends that Wright–Moore was not substantially associated with its trademark. Ricoh primarily points to Article 6(b) of the distributorship agreement which prohibited Wright–Moore from using Ricoh's name or trademark in any manner. The same clause of the distributorship agreement, however, permits Wright–Moore to state in writing that it is an authorized distributor for certain Ricoh products. Moreover, Wright–Moore was provided with advertising materials with Ricoh's trademark. In *Master Abrasives,* the court held that "distribution of products or services covered by [the franchisor's] trademark" was sufficient to satisfy the substantial association requirement. *Id.* at 1199. Wright–Moore clearly meets this standard.

Finally, Ricoh contends that Wright–Moore did not pay a franchise fee. Indiana defines a franchise fee as:

> any fee that a franchisee is required to pay, directly or indirectly, for the right to conduct a business to sell, resell, or distribute goods, services or franchises under a contract agreement including, but not limited to, any such payment for goods or services.

IND.CODE § 23–2–2.5–1(i). The statute expressly states that franchise fees do not include "the purchase or agreement to purchase goods at a bona fide wholesale price." *Id.* at 1(i)(3). Wright–Moore admits that it did not pay a direct franchise fee, but maintains that it paid indirect fees by way of payments for training, payments to maintain excess inventory, and ordinary business expenses.

To date, there is no published Indiana case that considers indirect franchise fees and the term is given little definition in the statute. The statute simply indicates that purchases at bona fide wholesale prices are not indirect fees. Since Indiana's franchise law has no legislative history, we interpret Indiana's law by reference to similar laws in other states and the purposes behind those laws.

The general policy behind franchise laws is particularly helpful in delineating the scope of the franchise fee requirement. The purpose of most franchise laws is to protect franchisees who have unequal bargaining power once they have made a firm-specific investment in the franchisor. *See* Note, *Constitutional Obstacles to State "Good Cause" Restrictions on Franchise Terminations,* 74 COLUM.L.REV. 1487 (1974). For example, the Wisconsin statute expressly states that its purpose is to protect dealers against "unfair treatment" from franchisors who "inherently have superior economic power and superior bargaining power." Wis.Stat. § 135.025(2). Our cases reflect this policy. "[W]e have deduced from the structure and history of the [Wisconsin] statute a central function: preventing suppliers from behaving opportunistically once franchisees or other dealers have sunk substantial resources into tailoring their business around, and promoting, a brand." *Kenosha Liquor Co. v. Heublein, Inc.,* 895 F.2d 418, 419 (7th Cir. 1990) (citations omitted). "The franchisor (supplier) may be able to change the terms for the worse after the franchisee (dealer) has invested much of its capital in firm-specific promotion, training, design, and other features. Once the dealer is locked into the supplier, the supplier may seek to extract what an economist would call a quasi-rent." *Fleet Wholesale Supply v. Remington Arms Co.,* 846 F.2d 1095, 1097 (7th Cir.1988). The reason for the franchise fee requirement, in this light, is to insure that only those entities that have made a firm-specific investment are protected under the franchise laws; where there is no investment, there is no fear of inequality of bar-

gaining power. *Id.* Wright–Moore's alleged fees must, therefore, show evidence of unrecoverable investment in the Ricoh distributorship.

Wright–Moore's first alleged fee was the cost of excess inventory. Courts and administrative bodies that have considered excess inventory requirements have held that the costs of required excess inventory can constitute a franchise fee, and we agree. For example, the Illinois franchise statute, which is almost identical to Indiana's statute, contains regulations interpreting the Illinois definition of franchise fees. 121½ ILL.REV.STAT. § 1703(14). These regulations explicitly include excess inventory, stating that "an indirect franchise fee ... is present despite the bona fide wholesale or retail price exceptions if the buyer is required to purchase a quantity of goods so unreasonably large that such goods may not be resold within a reasonable time." 14 Ill.Adm.Code, Ch. II § 200.108. Minnesota courts agree with Illinois that excess inventory can constitute a franchise fee. *See American Parts System, Inc. v. T & T Automotive, Inc.,* 1984 Bus. Franchise Guide (CCH) ¶ 8262 (Minn.App.1984); *see also Schultz v. Onan Corp.,* 737 F.2d 339, 346–47 (3rd Cir.1984). The purpose of the fee requirement also indicates that, depending on the particular facts of a case, investments in excess inventory may constitute an indirect franchise fee. If, for example, the excess inventory were not liquid or were such that the franchisor could prevent it from being liquid (perhaps by preventing the franchise from claiming it is an authorized dealer), then the excess inventory might be a franchise fee. A normal sales quota, however, is not enough to create a franchise fee because of the bona fide wholesale price exception. The quantity of goods must be so unreasonably large that it is illiquid.

Costs incurred in training, Wright–Moore's second alleged fee, may, for the same reasons, also result in an indirect franchise fee. Training can be highly firm-specific. Technicians trained to service Ricoh copiers may not be able to service other copiers. Costs incurred during training may be substantial and unrecoverable, locking the franchise into the franchisor.

Wright–Moore's third alleged franchise fee is simply ordinary business expenses. We noted in *Communications Maintenance, Inc. v. Motorola, Inc.,* 761 F.2d 1202, 1206 n. 3 (7th Cir.1985), that business expenses in the form of a discount given by the franchisee on goods or services it is required to tender to the franchisor would constitute an indirect franchise fee. Nevertheless, unless the expenses result in an unrecoverable investment in the franchisor, they should not normally be considered a fee. The bona fide wholesale price exception confirms this. In addition, the language of the statute indicates that ordinary business expenses may not be indirect fees. The statute defines a franchise fee as a fee paid for the *right* to do business, not as fees paid during the course of business. IND.CODE § 23–2–2.5–1(i); *see also RJM Sales & Marketing v. Banfi Products Corp.,* 546 F.Supp. 1368, 1373 (D.Minn.1982) (ordinary business expenses are not franchise fees).

The evidence on each of these alleged fees is unclear at this point in the litigation. For example, there is conflicting evidence about whether the amount Wright–Moore was required to purchase was excessive. Similarly, there is conflicting evidence about the nature and extent of the training program and we know almost nothing about the ordinary business expenses. Each of these matters is very fact specific and calls for judgment based on the individual circumstances of each case. We conclude, as did the district court, that summary judgment was not appropriate on the issue of whether Wright–Moore was a franchisee.

### 3. *Nonrenewal of the Distributorship Agreement*

■ IND.CODE §§ 23–2–2.7–1(7) and (8) declare unlawful any provision in a franchise agreement which permits the franchisee to be terminated or not renewed "without good cause or in bad faith." The district court found that Wright–Moore did not put forth sufficient evidence to show that its nonrenewal was in bad faith. The

court found instead that Wright–Moore's nonrenewal was based on economic reasons internal to Ricoh, which the court held was good cause in compliance with IND.CODE § 23–2–2.7–1(7). The district court also found that Wright–Moore was not discriminated against in violation of IND.CODE § 23–2–2.7–2(5) because none of Ricoh's national distributors were renewed and consequently Wright–Moore cannot show treatment different from similarly situated franchises. Wright–Moore contests these conclusions.

Wright–Moore argues that it has put forth sufficient evidence of a vendetta between executives of Ricoh and Jack Wright, the president of Wright–Moore, for a jury to conclude that bad faith motivated its nonrenewal. Specifically, Wright–Moore relies largely on a claim that Edward Kane, the eastern zone manager for Ricoh, testified (albeit under a hearsay objection) that Ricoh's national sales manager, Bill Johnson, had a personal dislike for Jack Wright. We believe that this evidence is insufficient to survive a motion for summary judgment. Our inquiry under Rule 56 is "the threshold inquiry of determining whether there is the need for a trial— whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* 106 S.Ct. at 2512. Kane's lone statement is contradicted by affidavits from Ricoh and by other statements within Kane's own deposition. In addition, Kane's statements about Johnson are hearsay as they are merely Kane's feelings about unstated feelings of Johnson about a third party. Wright–Moore has put forth no direct or substantial evidence of bad faith and bald assertions will not suffice. This simple statement of Kane's belief about someone's personal dislike is insufficient to overcome a summary judgment motion. The district court did not engage in the weighing of evidence and credibility to come to its conclusion; were a jury to conclude that Ricoh terminated Wright–Moore in bad faith, the district court would be compelled to grant a directed verdict. The district court, after an extensive review of the evidence, concluded that Ricoh terminated Wright–Moore to implement what it thought was a more effective marketing plan, and we agree.

Wright–Moore also argues that the district court erred in holding that termination for the franchisor's own economic reasons constitutes good cause. The statute defines good cause to "include[ ] any material violation of the franchise agreement." IND. CODE § 23–2–2.7–1(7). There is no evidence that Wright–Moore breached the franchise agreement, so Ricoh's actions did not fall within the plain terms of the statute. Good cause, however is defined to *include* breach of the franchise agreement. The language of the statute does not indicate that it is limited to breach. The question is whether good cause also includes termination for the benefit of the franchisor's balance sheet.

Indiana courts have not yet considered this issue. We believe, however, that the language and structure of the Indiana law, along with the guidance provided by interpretation of franchise laws in other states, compel a conclusion that the internal economic reasons of the franchisor are not, by themselves, good cause for termination or nonrenewal of a franchise. Primarily, Ricoh's suggested conclusion that the franchisor's economic reasons would constitute good cause directly contravenes the very purpose of franchise statutes and would render the statutes ineffective. As noted above, franchise statutes are designed to prevent franchisors from extracting quasi-rents from franchisees. They are designed to ensure fair dealing between the parties. If the business reasons of the franchisor were sufficient, the protections of the statute would be meaningless since it is in the franchisor's short term business interest (and therefore good cause) to act opportunistically. (While this may not be effective in the long term as the franchisor may lose reputation or good will, a court is unlikely to make this determination.) Even absent opportunistic behavior, a franchisor could

virtually always claim a plausible business reason for termination. Without a smoking gun, it would be difficult, if not impossible, for a franchisee to prove that a particular action is not in the business interests of the franchisor. Ricoh's suggested reading would, therefore, allow franchisors to extract rents from franchisees, the very behavior the statutes are designed to prevent.

This reasoning is supported by the decisions of several courts. In *Kealey Pharmacy & Home Car Services, Inc. v. Walgreen Co.*, 761 F.2d 345 (7th Cir.1985), we held that Walgreen's termination of all its Wisconsin franchises and replacement with Walgreen-owned stores was not supported by good cause. Walgreen had valid business reasons to make this change. Nevertheless, we held that because Walgreen intended to appropriate the good will established by the franchisees, Walgreen's behavior was opportunistic and therefore, economic justifications alone were not sufficient. *See also Remus v. Amoco Oil Co.*, 794 F.2d 1238, 1241 (7th Cir.1986) (good cause is limited to faults with the franchisee); *Carlos v. Philips Business Sys.*, 556 F.Supp. 769, 776 (E.D.N.Y.1983), *aff'd*, 742 F.2d 1432 (2nd Cir.1983) (restructuring designed to "address the market place as it exists today" is not good cause under the New Jersey franchise act); *General Motors Corp. v. Gallo GMC Truck Sales*, 711 F.Supp. 810 (D.N.J.1989) ("It is a violation of the [New Jersey franchise] Act, [ ] to cancel a franchise for any reason other than the franchisee's substantial breach ...").

In addition, the structure of the Indiana statute indicates that good cause refers only to problems with the performance of the franchisee. Sections 23–2–2.7–1(7) and (8) prohibit termination or nonrenewal without good cause and list material violations of the franchise agreement as an example of good cause. The language of the statute is inclusive; the statute does not say

material violations of the agreement are the sole legal cause for termination. The statute simply says that good cause *includes* material violations of the agreement. But as an example of the type of cause that the legislature had in mind, this indicates that the statute may be limited to other problems with the performance of the franchisee. Economic reasons internal to the franchisor do not fit this pattern; they generally have nothing to do with the performance of the franchisee.

Other franchise statutes have been interpreted in this manner. In *Solman Distributors Inc. v. Brown–Forman Corp.*, 888 F.2d 170, 172 (1st Cir.1989), the First Circuit held that business reasons of the franchisor were not good cause under the Maine franchise statute. The court examined the structure of the Maine franchising statute to determine that the franchisor's business needs are not cause for termination. Similarly, in *Remus*, 794 F.2d at 1240, we examined the structure of the good cause in Wisconsin to find that good cause is limited to the errors and omissions of the franchisee. We held that the statute gave dealers a kind of "tenure" where good cause "refers only to errors and omissions of the dealer." *Id.*

The district court relied on *American Mart Corp. v. Joseph E. Seagram & Sons, Inc.*, 824 F.2d 733, 734 (9th Cir.1987) (per curiam) for its holding. In *American Mart*, the Ninth Circuit held that Seagram's adoption of a new, nationwide marketing plan justified its termination of its Nevada franchises on the basis that the terminations were warranted by compelling business considerations and constituted a valid business judgment. *American Mart* is contrary to the majority of cases, as cited above, and does not provide any reasoning for its holding. To the extent that it is contrary to our holding, we find it unpersuasive.[4]

4. In *Medina & Medina v. Country Pride Foods, LTD.*, 858 F.2d 817 (1st Cir.1988), a case not cited by either party or the district court, the Puerto Rican Supreme Court, on a certified question from the First Circuit, held that good faith withdrawal from the market did not violate the Puerto Rican franchise act. *Medina*

deals with the special situation where the franchisor completely withdraws from the market. This situation is unique because there is a small chance that the franchisor is acting opportunistically when completely withdrawing from the market. Since the franchise statutes require fair dealing and market withdrawals carry little

In sum, we believe that the structure of the Indiana statute, and the policies behind the law, are sufficient to determine that under Indiana law, economic reasons internal to the franchisor are not sufficient to meet the good cause requirement. The purpose of the franchise statute is to protect the franchisee, and Ricoh's suggested reading of the statute is contrary to this purpose and would effectively nullify the statute. The structure of the statute further supports this result. We recognize Ricoh's concern that this decision makes the business decision to terminate or not renew a franchise that has not breached the franchise agreement much more expensive, but this concern is best addressed to the Indiana legislature.

■ Finally, with respect to the Indiana franchise laws, Wright–Moore claims that it was unfairly discriminated against in violation of IND.CODE § 23–2–2.7–2(5) which prohibits "discriminating unfairly among ... franchisees...." It claims that there were four national distributors and while all were terminated, at least one was offered a regional distributorship after its termination as a national distributor. This evidence, however, does not support the claim of discrimination. "Discrimination among franchisees means that as between two or more similar franchisees, and under similar financial and marketing conditions, a franchisor engaged in less favorable treatment towards the discriminatee than towards other franchisees." [5] *Canada Dry v. Nehi Beverage Co.*, 723 F.2d 512, 521 (7th Cir.1983). "Thus, proof of discrimination requires a showing of arbitrary disparate treatment among similarly situated individuals or entities." *Id.*

The evidence does not support Wright–Moore's claim. Most of the evidence relied on by Wright–Moore is the same evidence that it argued supported its claim of bad faith termination. As we noted above, this evidence was insufficient to create a material issue of fact with respect to bad faith. More importantly, Wright–Moore admits that it was the only true national distributor; all the other so-called national distributors only operated in smaller regions of the country. There is, therefore, no similarly situated distributor. Finally, even if all the so-called national distributors are considered similarly situated, none of them were renewed. This is strong evidence that there was no discrimination. While one of the national distributors became a regional distributor, this is not sufficient evidence of discrimination against Wright–Moore; it shows that failure to grant regional distributorships was the rule rather than the exception. We conclude that there is no issue of material fact with respect to discrimination and Ricoh was entitled to summary judgment on this count.

### B. Contract Claims

Wright–Moore raises two contract claims, both involving the letter agreement. First it argues that Ricoh breached the terms of the letter agreement when it unilaterally changed the terms of credit. Second, it argues that Ricoh failed to provide it with "price protection" by not preserving Wright–Moore's discount margin over other distributors. The district court held that

---

chance of unfair dealing, courts have considered market withdrawals to constitute good cause. This position is reflected in *Remus*, 794 F.2d at 1240–41, where we held that the Wisconsin statute allows termination only based on behavior of the franchisee and yet we specifically reserved the question of whether market withdrawal is good cause. *Medina*, therefore, is not directly relevant to the issue before us. Ricoh did not withdraw from the market; it simply changed distribution systems. On its facts, our case is closer to *Kealey*, 761 F.2d at 350, where Walgreen attempted to replace its franchisee with Walgreen-owned stores, than it is to *Medina*. Market withdrawal is not before us and we leave this issue for another case.

**5.** It should be cautioned that the requirement of a similarly situated party does not carry over to all areas of law where discrimination is prohibited. For example, a minority employee who is terminated because of minority status is discriminated against even when there is no similarly situated person. The discrimination provision in this statute, however, makes it unlawful for the franchisor to "discriminat[e] unfairly among its franchisees ..." IND.CODE § 23–2–2.7–2(5). This language indicates the necessity of a similarly situated franchisee. The situation analogous to a lone minority employee is where a single franchise is terminated for an unlawful reason and this situation falls under the good cause requirement.

Ricoh had the power to unilaterally change the terms of credit under the distributorship agreement, which it determined controls the interpretation of the letter agreement, and that price protection did not require Ricoh to preserve Wright–Moore's margin, but rather only required Ricoh to refrain from selling copiers to anyone else at a lower price.

■ With respect to the unilateral change in the credit terms, we need not reach the issue of whether the letter agreement is controlled by the clause in the distributorship agreement permitting unilateral modification, which was the basis of the district court's holding. Indiana franchise law makes it unlawful for a contract to allow "substantial modification of the franchise agreement by the franchisor without the consent in writing of the franchisee" IND.CODE § 23–2–2.7–1(3). The distributorship agreement could not lawfully allow substantial changes in the contract. Ricoh contends that the modification was not substantial. This is, however, a mixed question of fact and law and there is no evidence in the record on this issue. Summary judgment, therefore, was not appropriate with respect to this contract claim.[6]

■ Wright–Moore's second contract claim does not survive summary judgment. The letter agreement simply provides that Ricoh "will provide [Wright–Moore] with price protection" on the purchase of 1,200 copiers. Price protection is not defined in the letter agreement, but it is defined in the accompanying distributorship agreement. Article 2(b) of the distributorship agreement provides that "[i]f Ricoh lowers the price of any product within 60 days of its acceptance of an order from distributor for that product, such lower price shall apply to that previously accepted order." As the district court noted, in Indiana, "[w]hen writings are executed at the same time and relate to the same transaction or subject matter, they must be construed together in determining the contract ..." *Goeke v. Merchants Nat'l Bank & Trust*

*Co.,* 467 N.E.2d 760, 768 (Ind.App.1984). The documents here should be read together under *Goeke* and because the cursory use of the term "price protection" in the letter agreement indicates that its definition is contained elsewhere in the parties' various agreements. In this case, Article 2(b) provides that price protection merely insures that no one else receives a lower price, not that Wright–Moore's margin be protected. If the parties had desired to protect Wright–Moore's margin, it would have been simple to say so. Instead, nothing in the letter agreement gives any indication of this intent and the distributorship agreement specified protection of price, not margin. Wright–Moore has not put forth evidence that any party was offered a lower price, so summary judgment was appropriate.

Wright–Moore's only argument against this conclusion is that the past practices of the parties indicate a different intent. When the agreement is clear on its face, we need not reach the intent of the parties, but in any case, the past practices do not reveal a different intent. Wright–Moore claims that Ricoh once offered other distributors a price break in the form of a "baker's dozen" whereby they could purchase thirteen machines for the price of twelve. Wright–Moore was also offered this deal, even though the deal had not lowered the price below that offered to Wright–Moore and, therefore, would not have caused the price protection clause to operate. While this action did preserve Wright–Moore's margin, there is no evidence that this action was required by or triggered by the price protection clause. There is also no evidence that this was the usual practice rather than an exception. We conclude that summary judgment was appropriate on the price protection claim.

*C. Estoppel and Fraud*

■ Wright–Moore claims that Ricoh must be estopped from not renewing the contract based on its representations that

---

**6.** We do not analyze this or the remaining claims under New York law as Wright–Moore alleges that Indiana law applies and Ricoh agreed to assume that Indiana law applies to these claims for the purposes of appeal.

the agreement would be renewed absent poor performance by Wright–Moore. Specifically, Wright–Moore alleges that Ricoh's representatives informed it on numerous occasions "that plaintiff's distributorship would be renewed as long as plaintiff met its minimum purchase requirements and fulfilled its financial obligations to Ricoh, and that defendant terminated dealer or distributor contracts only for poor performance." Wright–Moore maintains that it "relied on those promises and representations and that therefore the defendant must be equitably estopped to deny the binding nature of its promises and representations."

Under Indiana law, "the following elements must exist to constitute equitable estoppel: there must be a false representation or concealment of material facts made with knowledge of the facts; the representation must have been made with the intention that it should be acted upon; the party to whom the representation was made must have been without knowledge or the means [to obtain] knowledge of the real facts; and that party must have relied on the representation to its prejudice." *Warner v. Riddell Nat'l Bank*, 482 N.E.2d 772, 775 (Ind.App.1985). "The real inquiry in most instances, then, is whether the complaining party acted reasonably when he relied on those he now seeks to estop rather than employing some other means to obtain the information." *Azar's v. United States Postal Serv.*, 777 F.2d 1265, 1270 (7th Cir.1985).

The district court held that Wright–Moore did not act reasonably when relying on Ricoh's alleged statements, and we agree. The agreement was specifically for one year; had Ricoh intended a longer term agreement, it could have been provided for. Moreover, the agreement contained an integration clause which provided that the agreement was "intended to be the full and complete statement of the obligations of the parties relating to the subject matter" and "supercede[d] all previous agreements, understandings, negotiations and proposals as to this agreement." Wright–Moore was not a novice in the business world and was or should have been familiar with contracts

and their operation. We recently noted that Indiana courts have never abrogated a written agreement based on an oral promise made prior to the written agreement, *Vickers v. Henry County Savings & Loan Ass'n*, 827 F.2d 228, 233 (7th Cir.1987), and none of the cases cited by Wright–Moore support our doing so now. There is no evidence to contradict these facts and consequently, summary judgment was appropriately granted on the estoppel count.

■ Wright–Moore also raises two fraud claims, one based on Indiana common law and the other based on the Indiana franchise statutes. Wright–Moore claims that Ricoh misrepresented its intent to renew the agreement when it made statements that the agreement would be renewed absent poor performance. With respect to the common law claim, the Supreme Court of Indiana has stated that "actionable fraud cannot be predicated upon a promise to do a thing in the future, although there may be no intention of fulfilling the promise." *Sachs v. Blewett*, 206 Ind. 151, 185 N.E. 856, 858 (1933). We have noted that "it has long been the law in Indiana that an action for fraud cannot based upon promises to be performed in the future." *Vaughn v. General Foods Corp.*, 797 F.2d 1403, 1412 (7th Cir.1986) (citations omitted). It is clear that Wright–Moore's claim of common law fraud cannot survive because it alleges a promise to act.

■ Wright–Moore's statutory fraud claim fairs no better. Indiana has defined fraud to "include[ ] any misrepresentation in any manner of a material fact, [or] any promise or representation or prediction as to the future not made honestly or in good faith...." While the state fraud provision does cover statements about future actions, and while there is evidence in the record that Ricoh did make a false prediction, there is no evidence that the prediction was not in good faith at the time it was made. This is an essential element of the claim on which Wright–Moore has failed to submit any evidence. Moreover, as noted above with respect to the estoppel claim, there was no reasonable reliance on this state-

ment. Without reasonable reliance on Ricoh's statements, Wright–Moore cannot show that it was damaged. Summary judgment was appropriate on the statutory fraud claim.

### III.

The case is remanded for proceedings consistent with this opinion.[7]

RIPPLE, Circuit Judge, dissenting.

The task that the court undertakes in this case is indeed a most difficult one. At the heart of this litigation are the Indiana franchise laws—legislation that has been subject to little relevant interpretation by the Indiana courts. This statutory scheme is important to the State of Indiana. It embodies crucial policy choices affirmatively made by the legislature in an effort to balance, in a way that makes sense in the commercial and social life of Indiana, the freedom to enter into contracts and the need to regulate the practices of the franchise industry. In undertaking the task of deciding this appeal, the court resolves definitively two issues of statutory interpretation: (1) whether the Indiana franchise laws would recognize the choice of law clause in the contract; (2) whether "good cause" in the statutory scheme refers only to problems with the performance of the franchisee. With respect to both questions, the court does not have, as it never has when it deals with Indiana law, the assistance of legislative history. Nor does

it have any significant judicial interpretation from the Indiana courts. It must therefore turn to analytical tools that are far less precise—reliance on bits and pieces of statutory language, analogous case law from other jurisdictions, and the pronouncements of United States district judges sitting in the State of Indiana.

All of these devices are legitimate tools of the jurist faced with the task of dealing with the black hole of legislative ambiguity. Indeed, they are often the only tools available. However, they do have their distinct infirmities. The perils of relying on bits and pieces of statutory language cut adrift from their moorings in the statute are well known and need little elaboration here. Reasoning by analogy to the case law developed in other jurisdictions is perilous because we do not know whether those jurisdictions made the same policy choices as did Indiana.[1]

It certainly is appropriate to give significant weight to the views of our colleagues on the district bench in Indiana. *See PPG Indus., Inc. v. Russell,* 887 F.2d 820, 823 (7th Cir.1989). We must remember, however, that at times this practice amounts to the blind leading the blind. For reasons not entirely clear to me, Indiana has not given federal district courts within the state the power to certify questions of state law to the Indiana courts and, consequently, the judges of those courts must do the best they can without such assistance.[2]

---

**7.** We do not reach the cross-appeal's change of venue claim. It was not considered by the court below and is not appropriately considered for the first time on appeal. In addition, in light of our remand, we do not reach Wright–Moore's punitive damage claim.

**1.** As a practical matter, this process of reasoning by analogy often is flawed by overdependence on the law of other jurisdictions within the circuit. This overdependence is quite natural because the circuit judges are more familiar with the law of the other states within their circuit. However, we must acknowledge that, as Justice Schaefer of the Illinois Supreme Court pointedly reminded us, "[t]here is no element of sovereignty in a federal judicial circuit." Schaefer, *Reducing Circuit Conflicts,* 69 A.B.A. J. 452, 454 (April 1983). It is simply an administrative subdivision of the federal judiciary. A state within the circuit need not see

policy matters the same way as the other states grouped together by the Congress for the purpose of administering federal law. We must be careful not to permit our dependence on analogous sources of interpretation to result in a "law of the circuit" with respect to a matter of state law. *See Chang v. Michiana Telecasting Corp.,* 900 F.2d 1085, 1087 (7th Cir.1990) ("We certify questions to ensure that 'the law we apply is genuinely *state* law, and not a federal court's perception of what state judges ought to hold.' ") (quoting *Covalt v. Carey Canada Inc.,* 860 F.2d 1434, 1441 (7th Cir.1988)) (emphasis supplied by *Covalt* court).

**2.** *See* Ind.Code Ann. § 33–2–4–1 (providing statutory authorization for the Supreme Court of Indiana to answer certified questions from the *Supreme Court of the United States, any United States circuit court of appeals, and the court of*

The majority appears to recognize the hazards of depending on the pronouncements of district judges under these circumstances because, while relying on such a methodology with respect to the choice of law question (despite the uncertainty as to how all the district judges who have ruled on the matter would decide the issue before us),[3] the majority pointedly declines to follow the district court's interpretation of the statute with respect to the good cause termination argument.

If the court had used all the tools at its disposal, one might have to conclude that, while the issues are indeed close calls, the court had done all that it could with the materials at hand. However, unlike our colleagues in the district court, we can do more. Indeed, there are very clear signs that the legislature of Indiana, and, by their passage of a constitutional amendment, the people of Indiana, would like us to do more. By two separate provisions of law, Indiana has made it clear that it very much cares that ambiguities in the law of the state be clarified on a regular basis by the supreme court of the state. The legislature has enacted a statute that permits this court to certify a controlling question of state law to the Supreme Court of Indiana.[4] More recently, the constitution of the state has been amended to ensure that the Supreme Court of Indiana has sufficient control of its own docket to permit it to spend the time needed to clarify important points of state law in civil litigation.[5]

Of course, we cannot—and indeed should not—certify every issue on which there is some ambiguity. After all, the constitution gives us independent responsibility for the adjudication of cases properly within our diversity jurisdiction. Moreover, we must be respectful of the workload of our colleagues in the state courts. Nevertheless, despite these considerations, we must balance these concerns against the manifest concern of Indiana that it be allowed to develop its own jurisprudence. A good starting point in striking that balance would be to identify those areas of state jurisprudence where there is a particular need or manifest state interest in controlling the development of the law. We also ought to attempt to identify those areas where the very nature of the litigation makes it evident that a good number of the cases will be brought in the federal courts and where, unless certification is used to resolve major issues, the federal courts, simply by virtue of the choice of forum, will have a virtual monopoly over the development of the law in that field.[6] When these two concerns are present, there is an especially good case for certification.

Such a situation exists in the present case. We are not dealing here with some esoteric, nonrecurring question of common law. Rather, we are dealing with the interpretation of a statutory scheme enacted by the state legislature to deal with an important area of commerce that has been the scene in modern of times of much abuse and where the need for a careful balance between freedom of contract and governmental regulation is particularly acute. It is also an area where the very nature of the litigation—often involving national franchisors and local franchisees and sig-

---

appeals of the District of Columbia, but omitting any reference to the United States district courts); Indiana Rule of Appellate Procedure 15(O) (incorporating the statutory authorization).

**3.** *See cases* cited *supra*, p. 133, note 1. To the degree these cases exhibit differing views among the district judges of Indiana, the case for certification is indeed stronger.

**4.** *See supra* note 2.

**5.** *See* Ind. Const. art. 7, § 4 (West Supp.1989) (before the 1988 amendment to this section, the

appellate jurisdiction of the Supreme Court of Indiana extended to criminal cases in which a sentence of greater than *ten years* was imposed; the section as amended reduces the scope of appellate jurisdiction to cases in which a sentence of greater than *fifty years* was imposed.

**6.** *Cf. Covalt v. Carey Canada Inc.*, 860 F.2d 1434, 1440 (7th Cir.1988) (issue concerning the interplay between a "discovery rule" of limitations for disease based tort actions and Indiana's ten year statute of repose was certified to the Indiana Supreme Court in a situation where the law of asbestos litigation in Indiana had been developed exclusively through federal diversity cases).

nificant amounts of money—makes diversity jurisdiction quite probable. Under these circumstances, certification of the controlling points of law is, in my view, the appropriate course. Accordingly, I respectfully dissent.