**P. Stephen KINNARD, et al.**

v.

**SHONEY'S, INC.**

No. 3-98-0641.

United States District Court,
M.D. Tennessee,
Nashville Division.

April 26, 2000.

William R. Willis, Jr., Willis & Knight, Nashville, TN, Arthur S. Robinson, Jr., Arthur S. Robinson Jr. & Associates, Indianapolis, IN, for P. Stephen Kinnard, E. Glyn Kinnard, Stephanie K. Cox.

Matthew Joseph Sweeney, III, Kathryn A. Stephenson, Tuke, Yopp & Sweeney, Nashville, TN, Peter A. Velde, Indianapolis, IN, for Shoney's Inc.

Robert Jackson Walker, Walker, Bryant & Tipps, Nashville, TN, for Dennis C. Bottorff.

## MEMORANDUM

HIGGINS, District Judge.

By order (entered April 30, 1999; Docket Entry No. 110), this action was referred to the Magistrate Judge for consideration and submission of proposed findings of fact and recommendation for disposition of the defendant's motion (filed April 2, 1999; Docket Entry No. 73) for summary judgment. In his Report and Recommendation (entered June 22, 1999; Docket Entry No. 126), the Magistrate Judge recommended that the defendant's motion (filed April 2, 1999; Docket Entry No. 73) for summary judgment be granted in all respects. The plaintiffs have filed a motion (filed July 26, 1999; Docket Entry No. 129) for de novo determination of the defendant's motion for summary judgment.[1] Also before the Court is the defendant's reply (filed August 24, 1999; Docket Entry No. 139) to the plaintiffs' motion for de novo determination.

The Court has jurisdiction over this matter based on diversity of citizenship and the amount in controversy under Title 28 U.S.C. § 1332(a)(1).

For the reasons set forth below, the plaintiffs' objections to the Report and Recommendation are overruled. Accordingly, the conclusions of the Report and Recommendation will be adopted and approved and the defendant's motion for summary judgment will be granted.

### I.

On June 26, 1997, the plaintiffs, Stephen Kinnard, Glyn Kinnard and Stephenie Cox, Indiana citizens, and Kinnard Enterprises,

---

1. Although the pleading is styled a motion for de novo review of the defendant's motion for summary judgment, it is considered objections to the Report and Recommendation. In their memorandum in support of motion for de novo review (Docket Entry No. 134), the plaintiffs made 33 objections to the Report and Recommendation.

Inc., an Indiana corporation, originally filed this action[2] in the Superior Court of Marion County, Indiana, against the defendants, Shoney's, Inc., a Tennessee corporation with its principal place of business in Nashville, Tennessee; Shoney's Ownership Plan 1977; and members of Shoney's board of directors, including Dennis C. Bottorff, Carole F. Hoover, Victoria B. Jackson, C. Stephen Lynn, Jeffery F. Schoenbaum, B. Frankin Skinner and Cal Turner, Jr. The plaintiffs asserted violations of Indiana's Deceptive Franchise Practice Act, Indiana Code § 23–2–2.7, et. seq., Indiana Franchise Disclosure Act, Indiana Code § 23–2–2.5, et. seq., and numerous common law claims. The plaintiffs sought injunctive relief and an accounting.

Their action was removed to the District Court for the Southern District of Indiana based on diversity of citizenship pursuant to 28 U.S.C. § 1332 under 28 U.S.C. § 1441(b). See notice of removal (Docket Entry No. 1). Upon the defendant's motion to transfer pursuant to 28 U.S.C. § 1404(a), this action was transferred to the Middle District of Tennessee. See order of transfer (Docket Entry No. 41).[3]

In the first amended complaint (filed October 5, 1998; Docket Entry No. 57) of plaintiffs P. Stephen Kinnard, E. Glyn Kinnard and Stephenie K. Cox, against Shoney's, Inc.,[4] the plaintiffs assert breach of franchise agreements, violations of the Indiana franchise statutes, franchise fraud and common law fraud, breach of fiduciary duty to franchisees, trover and conversion, constructive fraud and breach of fiduciary duty to joint venturers.

Shoney's, Inc. is a franchisor of restaurants. Mr. Kinnard was an employee of Shoney's, Inc. until about 1987, at which time his employment was terminated. Mr.

Kinnard was offered the opportunity to become a franchisee of Shoney's and entered into a licensing agreement with Shoney's on December 26, 1989, giving him permission to open a Shoney's restaurant at 9150 N. Michigan Road in Indianapolis, Indiana. This restaurant was opened in the spring of 1989. Mr. Kinnard entered into a second licensing agreement with Shoney's on April 1, 1991, which gave him permission to open a Shoney's restaurant at 2160 N. State Street, Greenfield, Indiana, which he subsequently opened.

The record reflects that Mr. Kinnard failed to read the licensing agreements for these restaurants before signing them. Mr. Kinnard assigned both the Michigan Road and the Greenfield licensing agreements to himself, his wife Glyn Kinnard and his daughter Stephanie Cox on May 15, 1991. The plaintiffs signed an addendum to both licensing agreements on June 7, 1991, naming each of the plaintiffs as franchisees under each agreement.

On April 11, 1995, the comptroller of Shoney's wrote to Mr. Kinnard, stating that the plaintiffs' account with Shoney's was delinquent, that their accounts receivable balance was $49,287.53 and that $30,-301.69 was past due. The letter made demand for the $30,301.69, and stated that if Shoney's demand was not met, it would consider the licensing agreements to be in financial default.

In May of 1995, when Shoney's demand had not been met, Shoney's sent Mr. Kinnard a proposed forbearance agreement which created a payment plan for the plaintiffs' debt. The forbearance agreement included a provision releasing Shoney's from liability to the plaintiffs. Mr. Kinnard read the agreement and under-

---

2. Their action was styled, P. Stephen Kinnard, et al. v. Shoney's, Inc., et al., Case No. 49D110706–CP0948. See notice of removal (filed July 14, 1997; Docket Entry No. 1) Exhibit A.

3. No date of entry was indicated on this order.

4. The other original defendants and plaintiff, Kinnard Enterprises, Inc., were not named as parties to this action in the amended complaint.

stood that it would release any claims by him against Shoney's. He discussed the agreement with his accountant, Greg Heldman, who drafted counter-proposals which were submitted to Shoney's.

On May 25, 1995, Mr. Kinnard wrote a letter to Mr. Charlie Vaughn at Shoney's, stating that "[d]uring 1994, as a result of increased competition and higher costs to do business, I was unable to save enough cash during the summer to get me through the slow months of winter." Plaintiffs' response to defendant's statement of undisputed facts (filed April 26, 1999; Docket Entry No. 105), ¶ 129. The plaintiffs now contend that there was a decline in their businesses attributable to Shoney's failure to operate its company-owned stores in the Indiana marketplace properly and its failure to provide the plaintiffs with adequate advertising and support, and therefore, they did not pay Shoney's in 1995.

By September 14, 1995, the amount Shoney's claimed was past due from the plaintiffs was $39,460.75. Shoney's requested that Mr. Kinnard submit a workable payment plan. In response, Mr. Kinnard asked Shoney's to purchase the two restaurants in 1995 and again 1996. By letter dated March 7, 1996, Shoney's decided not to purchase either store. *See* declaration of Beverly Donahue (filed April 2, 1999; Docket Entry No. 80) Exhibit N. Ms. Donahue, Shoney's manager of franchise administration, stated that the decision Shoney's made was based on a financial analysis conducted by Shoney's.

Shoney's did purchase restaurants from franchisees Robert Langeford and Ronald Cook in late 1995, and from franchisee Gary Spoleta in late 1996. The plaintiffs contend that by refusing to purchase their restaurants while purchasing restaurants of other franchisees who were in similar financial trouble, the defendant discriminated against them in violation of the Indiana Deceptive Franchise Practice Act, Indiana Code § 23–2–2.7–2(5).

After Shoney's declined to purchase the plaintiffs' restaurants, it advised Mr. Kinnard that if the plaintiffs could not repay their debt, they would either have to sell the restaurants or close them. Shoney's and Mr. Kinnard continued discussions regarding repayment and the possibility of the plaintiffs signing a forbearance agreement.

Shoney's contends that the plaintiffs were indebted to it in the amount of $99,036.13 by September 20, 1996. The plaintiffs dispute this amount. They argue that, according to the Indiana Deceptive Franchise Practice Act, § 23–2–2.7–2(6), Shoney's was required to credit them for rebates they allege Shoney's received due to the plaintiffs' purchases of goods from the Commissary.[5] The plaintiffs argue that the amount of their debt should be reduced by the amount that the defendant wrongly failed to pay or credit them under the Act.

By letter of October 14, 1996, Shoney's notified the plaintiffs that, because their

---

**5.** Shoney's Commissary, operated by Commissary Operations, Inc., is a wholly-owned subsidiary of Shoney's. The licensing agreements provide that Shoney's franchisees may purchase food and supplies from the Commissary or from sources other than the Commissary, so long as Shoney's is provided an opportunity to review the quality of the food and approve it. Many franchisees purchase products from sources other than the Commissary and some franchisees purchase nothing or nearly nothing from it. The plaintiffs' restaurants purchased some products, such as ice cream, from other sources. However, the plaintiffs always purchased the majority of their food and supplies from the Commissary

without looking for other sources because "doing so would consume a great deal of time with no guarantee that the [alternate] vendors would offer [them] a steady price." Defendant's response to plaintiffs' statement of undisputed facts (filed May 14, 1999; Docket Entry No. 115), ¶ 20.

However, the plaintiffs also contend that, although the licensing agreements did not explicitly require that the franchisees purchase food from the Commissary, they were in effect forced to purchase from the Commissary because of the difficulty in obtaining product approval from Shoney's and competitive prices from other suppliers. The plaintiffs offered no evidence to support this allegation.

alleged default had not been cured, the licensing agreements for both of their restaurants were terminated. Shoney's asked the plaintiffs to close the restaurants. Mr. Kinnard requested that they be allowed to keep the Greenfield restaurant open, to which Shoney's agreed on the condition that the plaintiffs consent to a timetable in which they were to repay Shoney's and that the plaintiffs execute a forbearance agreement.

On October 15, 1996, the plaintiffs closed the Michigan Road restaurant. They never closed the Greenfield restaurant. On October 24, 1996, Shoney's sent the Kinnards three documents for execution: a termination agreement, a reinstatement agreement and a forbearance agreement. The termination agreement terminated the December 26, 1988, licensing agreement for the Michigan Road restaurant; the reinstatement agreement reinstated the Greenfield licensing agreement and the forbearance agreement provided that the plaintiffs would repay the defendant. Each of these agreements contained a release provision. These agreements were executed on October 30, 1996, on the advice of the plaintiffs' attorney.

It is undisputed that Mr. Kinnard and Ms. Cox read, or had the opportunity to read, the termination, reinstatement and forbearance agreements, and that Mr. Kinnard realized that the language in the agreements extinguished all claims they had against Shoney's. However, Mr. Kinnard contends that he was not aware of the plaintiffs' claims against the defendant at the time the plaintiffs executed the agreements. Mrs. Kinnard disputes that she understood the effect of the agreements.

Through February of 1997, the plaintiffs made payments to Shoney's as provided under the forbearance agreement. After February, 1997, the plaintiffs paid only a portion of what they were required to pay under the agreement per week and eventually stopped the payments.

In addition to the two restaurants, Mr. Kinnard also invested in Shoney's group joint venture ownership plan on July 18, 1977. Through this plan, employees and officers of Shoney's could invest in a group of Shoney's restaurants. The ownership plan did not actually own any tangible assets of the group of restaurants, but invested in the restaurants and were to receive profits from them. Like all other company-owned restaurants, Shoney's was to operate these restaurants. Mr. Kinnard paid $7,500.00 to acquire a total of three investment units in the ownership plan.[6] The private placement offering circular for the 1977 ownership plan stated that Shoney's would be the administrator, promoter and managing agent of the group. See plaintiffs' response (Docket Entry No. 105), ¶ 205.

Nine restaurants were selected in 1977 for inclusion in the ownership plan. Mr. Kinnard contends that Shoney's breached its fiduciary duty to him and the investors by failing to maintain certain records of the ownership plan, by overcharging fees to the joint venture restaurants, and by adding certain restaurants to the joint venture plan in order to shift losses from Shoney's to the plan. Mr. Kinnard also contends that Shoney's failure to maintain the documents of the plan constituted bad faith on the part of Shoney's.

## II.

As provided by Federal Rule of Civil Procedure 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202, 211 (1986). In its consideration of the evidence, the Court must

**6.** There were a total of 90 investment units in the Shoney's ownership plan.

view all facts and inferences to be drawn therefrom in the light most favorable to the non-moving party. *Davidson & Jones Dev. Co. v. Elmore Dev. Co.*, 921 F.2d 1343, 1349 (6th Cir.1991).

In order to prevail on a summary judgment motion, the moving party bears the burden of proving the absence of a genuine issue of material fact concerning an essential element of the opposing party's action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986); *Davidson & Jones Dev. Co.*, 921 F.2d at 1349; *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). A dispute about the material fact must be genuine, that is, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." [7] *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211–12. Since the preponderance of the evidence standard is used in this determination, more than a mere scintilla of evidence in support of the plaintiffs' position is required. *Id.* at 252, 106 S.Ct. at 2512, 91 L.Ed.2d at 214.

Once a motion for summary judgment has been made, "the non-moving party bears the responsibility to demonstrate that summary judgment is inappropriate under Rule 56(e)." *Davidson & Jones Dev. Co.*, 921 F.2d at 1349. The non-moving party may not merely rest on conclusory allegations contained in the complaint, but must respond with affirmative evidence supporting its claims and establishing the existence of a genuine issue of material fact. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at 274; *Cloverdale Equip. Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (6th Cir.1989). While the disputed issue does not have to be

resolved conclusively in favor of the non-moving party to defeat summary judgment, "sufficient evidence supporting the claimed factual dispute" must be shown, thereby requiring resolution of the parties' differing versions of the truth by a jury or judge. *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2510, 91 L.Ed.2d at 212; *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569, 592 (1968).

## III.

### A. Choice of Law

As a preliminary matter, the Court must determine the law that is applicable to this case. The defendant contends that Tennessee law should apply to all the plaintiffs' claims except their claims based on violations of Indiana franchise statutes, to which Indiana law should be applied.[8]

■ "When a defendant transfers a case to another district under 28 U.S.C. § 1404, the *Erie* doctrine [9] requires that the court apply the *choice of law* rules of the transferor state." *In Re Bendectin Litigation*, 857 F.2d 290, 305 (6th Cir.1988) (emphasis in the original)(citing *Van Dusen v. Barrack*, 376 U.S. 612, 637–39, 84 S.Ct. 805, 819–21, 11 L.Ed.2d 945 (1964)). Accordingly, because Shoney's transferred this case from Indiana to Tennessee under 28 U.S.C. § 1404, the Court shall apply the choice of law rules of the State of Indiana.

■ Under Indiana's choice of law rules, the "most intimate contacts" test generally governs which state's laws should be applied. However, Indiana courts also honor contractual choice of law

**7.** The Supreme Court further explained that a court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. at 2512, 91 L.Ed.2d at 214.

**8.** The plaintiffs do not discuss the choice of law issue in this case, but it appears from

their discussion of their claims, that they agree with the defendant as to which state's laws should be applied.

**9.** In *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the United States Supreme Court found that except in matters regarding federal questions, federal courts should apply the law of the state.

clauses. *See Albright v. Edward D. Jones & Co.,* 571 N.E.2d 1329, 1332 (Ind.Ct.App. 1991) (citing *Volt Info. Sciences Inc. v. Board of Trustees,* 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989)). When considering Indiana choice of law rules, the United States Court of Appeals for the Seventh Circuit has stated that "the Restatement [(Second) Conflict of Laws § 188] approximates Indiana law." *Wright–Moore Corp. v. Ricoh Corp.,* 908 F.2d 128, 132 (7th Cir.1990) (citing *Utopia Coach Corp. v. Weatherwax,* 177 Ind.App. 321, 379 N.E.2d 518, 522 (1978)). According to the Restatement, " '[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.' " *Id.* (citing Restatement (Second) Conflict of Laws § 187(1)).

■ The Michigan Road licensing agreement states that "[t]he terms of this agreement shall be interpreted and construed in accordance with the laws of the State of Tennessee." Plaintiffs' response (Docket Entry No. 105), ¶ 12. The Greenfield licensing agreement states:

> The law regarding franchise registration, employment, covenants not to compete, and all other matters of local concern will be governed by the laws of the State of Indiana; however, as to contractual matters and all other matters, this agreement and all provisions of this instrument will be and remain subject to the application, construction, enforcement and interpretation under the governing law of the State of Tennessee. To the extent however, that the License Agreement or the laws of the State of Tennessee differ from the Indiana Franchise Disclosure Law or the Indiana Deceptive Franchise Practices Law, such Indiana laws shall supersede and control.

*Id.,* ¶ 13, Addendum. Accordingly, the Court shall apply Tennessee law to the common law claims regarding the contractual relationship of the parties.

With respect to plaintiffs' claims of statutory violations of the Indiana franchise statutes, as noted above, the language in the Greenfield licensing agreement states that Indiana law shall apply to these claims when Indiana law conflicts with Tennessee law. Additionally, the Seventh Circuit has found that there is a "legislative policy against waiver of Indiana franchise law through choice of law provisions." *Wright–Moore Corp.,* 908 F.2d at 134. Accordingly, the Court finds that, whereas Tennessee law generally applies to the issues in this case, the plaintiffs' claims under the Indiana franchise statutes are governed by Indiana law.

The termination, reinstatement and forbearance agreements also choose Tennessee law. Plaintiffs' response (Docket Entry No. 105), ¶¶ 163–165. They each state, "[t]his instrument shall be construed and interpreted in accordance with the laws of the State of Tennessee." *Id.* Accordingly, the Court shall also apply Tennessee law to the plaintiffs' claims regarding the reinstatement, termination and forbearance agreements-including the plaintiffs' claim of economic duress.

With respect to Mr. Kinnard's claims based on the ownership plan, there is no evidence that the joint venture agreement contained a choice of law provision. Accordingly, the Court must determine, under the most intimate contacts test, which state's law applies.

■ When applying this test, " '[t]he court will consider all acts of the parties touching the transaction in relation to the several states involved and will apply as the law governing the transaction the law of that state with which the facts are in most intimate contact.' " *Wright–Moore Corp.,* 908 F.2d at 132 (citing W.H. *Barber v. Hughes,* 223 Ind. 570, 63 N.E.2d 417, 423 (1945)). In *Employers Ins. of Wausau v. Recticel Foam Corp.,* 716 N.E.2d 1015,

1024 (Ind.Ct.App.1999), the Court explained that:

> Indiana's choice of law rule for contract actions calls for applying the law of the forum with the most intimate contacts to the facts. *Hartford Acc. & Indem. Co. v. Dana Corp.,* 690 N.E.2d 285, 291 (Ind. Ct.App.1997), trans. denied. The following are representative of the factors to consider: (a) the place of contracting; (b) the place of contract negotiation; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation, and place of business of the parties. *Eby v. York–Division, Borg–Warner,* 455 N.E.2d 623, 626 (Ind.Ct.App.1983) (citing Restatement (Second) of Conflict of Laws § 188 (1971)).

█ At the time Mr. Kinnard entered into the joint venture agreement, he was an employee of Shoney's in Tennessee and a resident and citizen of Tennessee. Additionally, the ownership plan was formed in Tennessee. Accordingly, the Court finds that, under the most intimate contacts test, Tennessee law applies to Mr. Kinnard's claims based on the ownership plan.

### B.   Discovery Dispute

█ The Court is also faced with a discovery dispute. The plaintiffs contend that they did not have sufficient time in which to conduct discovery and that the Court should allow them additional time. The plaintiffs also contend that the defendant did not fully comply with their requests for production of documents.

The Magistrate Judge found that the parties had been granted more than 20 months in which to conduct discovery and that this amount of time was sufficient. The plaintiffs object to these findings, based in part on the determination of the Magistrate Judge that discovery had not been stayed in this matter.

The Court agrees with the plaintiffs that the Magistrate Judge was mistaken in his conclusion that discovery had never been stayed in this matter.[10] Nevertheless, the parties were allowed to conduct discovery for almost four months, from the entry of the Court's case management order on November 16, 1998 (Docket Entry No. 59), until the close of business on March 12, 1999. Accordingly, the Court affirms the conclusion of the Magistrate Judge that the parties were granted sufficient time in which to conduct discovery and will not grant the parties additional time.

█ With respect to the plaintiffs' contention that the defendant failed to comply with their requests for documents, the Magistrate Judge correctly noted that the plaintiffs filed a motion (filed March 19, 1999; Docket Entry No. 68) to compel discovery. The Court denied the plaintiffs' motion for failure to comply with the Court's case management order. *See* order (entered April 20, 1999; Docket Entry No. 98).[11] The Magistrate Judge concluded that, because the plaintiffs failed to move to compel discovery in the proper manner, they should now be denied their request for an additional opportunity for discovery based on their contention that the defendant failed to comply with their request for production of documents. The Court agrees and affirms the determination of the Magistrate Judge with respect to the plaintiffs' request for additional time.

---

**10.** On November 20, 1997, Magistrate Judge Godich of the Southern District of Indiana issued an order (No. IP 97 01128 CT/G) staying the proceeding. *See* Appendix of cases and documents (filed July 26, 1999; Docket Entry No. 130) at document 1. Discovery was stayed in this matter from this date until the entry of the Court's case management order (Docket Entry No. 59) on November 16, 1998.

**11.** Specifically, the Court denied the plaintiffs' motion to compel because it was "filed in direct contravention of the case management order (Docket Entry No. 59) entered November 16, 1998, with regard to the submissions of a jointly signed discovery/protective order dispute statement."

## C. Releases

The defendant asserts that it is entitled to summary judgment for any claims based on the licensing agreements or "any action [by Shoney's] taken under any document between Shoney's and franchisees" arising prior to October 30, 1996, in accordance with the releases found in the termination, reinstatement and forbearance agreements. The termination, reinstatement and forbearance agreements were signed by the plaintiffs on the advice of their counsel, Mr. Bill Hodde, on October 30, 1996.

The release found in the termination agreement provides in pertinent part:

2.2 *By Franchisees.* Franchisees, as of the date of this Agreement, hereby release and forever discharge Shoney's and each of its subsidiary corporations from all claims, demands, rights and causes of action of any kind that Franchisees have or hereafter may have on account of or in any way arising out of or related to the Shoney's Franchise Agreement.

Plaintiffs' response (Docket Entry No. 105), ¶ 164.

The reinstatement agreement states that Shoney's releases the franchisees for claims arising out of the Greenfield restaurant agreement and that:

Franchisees acknowledge and stipulate that it is justly indebted to Shoney's and that it has no claims, setoffs, or causes of action against Shoney's. Franchisees thereby release and forever discharge Shoney's, its subsidiaries, officers, employees and agents, from all claims, demands, rights and causes of action of any kind, whether know[n] or unknown, that Franchisees have or hereafter may have on account of or in any way arising out of or related to the Termination Notice, the Shoney's License Agreement covered under the Termination Notice or the business relationship between the Franchisees and Shoney's that occurred prior to the date of this Agreement.

Franchisees represent and warrant that, except for those rights granted in the April 1, 1991 Shoney's Licensing Agreement, which is being reinstated pursuant to this Agreement, Franchisees neither have or claim to have any other rights to develop or operate any restaurant concept owned by Shoney's.

*Id.,* ¶ 163.

Likewise, the forbearance agreement stated in pertinent part:

6. *Release of Claims Against Shoney's.* In addition to all representations and warranties made herein regarding the Arrearage, and supported by the consideration recited, Franchisee expressly waives any and all claims or causes of action for any damage, including legal fees and expenses, incurred by the Franchisee through the date of the execution of this Agreement as a result or in any way attributable to Shoney's, or as a result of any action taken under any document between Shoney's and Franchisee.

*Id.,* 165.

The plaintiffs contend that the releases are invalid because they executed the agreements under economic duress. In his Report and Recommendation, the Magistrate Judge found that the releases were valid and recommended that the motion for summary judgment be granted with respect to all of the plaintiffs' claims based on the licensing agreements arising before October 30, 1996, in accordance with the release language found in the agreements. The Magistrate Judge also found that the plaintiffs' challenge of the releases is waived because the plaintiffs accepted the benefit agreements in order to continue the operation of the Greenfield restaurant and maintain their association with Shoney's.

The plaintiffs object and reassert their contention that the releases are invalid because they entered into the agreements under economic duress. Specifically, the plaintiffs contend that they agreed to enter

the termination, reinstatement and forbearance agreements "only after being deprived by Defendant of their only means of livelihood, and based on the Defendant's offer to restore that means of livelihood upon execution of the Releases and Defendant's repeated promise to enforce the liquidated damages provisions of Plaintiffs' Franchise Agreement if the Releases were not signed." Plaintiffs' memorandum (Docket Entry No. 134) in support, 15.

It is possible to assert a defense to the enforcement of a release by clearly establishing that the release was made under economic duress. *Davenport v. Home Fed. Bank of Tennessee*, No. 03A01–9401–CV–00034, 1994 WL 287591, at *4 (Tenn.App. June 30, 1994). The definition of economic duress is " 'imposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress or extreme necessities or weakness of another.' " *Id.* (quoting *Crocker v. Schneider*, 683 S.W.2d 335, 338 (Tenn.App.1984)). In order to constitute duress, the pressure must be such that it would "overcome the mind and will of a person of ordinary firmness." *Federal Deposit Ins. Corp. v. Ramsey*, 612 F.Supp. 326, 328 (E.D.Tenn.1985) (quoting *Fogg v. Union Bank*, 63 Tenn. 530, 535 (1874)).

In *Davenport*, the only evidence the plaintiff put forth to support his defense of economic duress was his affidavit stating that he felt he had to sign a release in order to survive economically. The Tennessee Court of Appeals found that this evidence was insufficient to establish economic duress even though the plaintiff may have had "legitimate fears as to his future economic well-being." *Davenport*, 1994 WL 287591 at *4. The Court also noted that the plaintiff had nearly three months to consider whether to sign the release and had the assistance of counsel in deciding to do so.

In *Ramsey*, the defendant claimed that he was under duress when he agreed to purchase stock in a bank from which he had applied to receive a loan. The United States District Court for the Eastern District of Tennessee found that the defendant's subjective belief that he was under pressure to purchase stock was not sufficient to constitute economic duress without more. *Ramsey*, 612 F.Supp. at 328–29. Of importance to the Court in this case was also the fact that several months elapsed between the time the defendant was asked to purchase the stock and the time the stock was purchased. *Id.* at 329.

Likewise, in this case, the plaintiffs were under certain economic pressure and had legitimate concerns about their economic future. However, this is not sufficient to constitute economic duress. Moreover, the record reflects that the defendant first presented the agreements to the plaintiffs in May of 1995, and that they did not execute them until October 30, 1996. Accordingly, the plaintiffs had approximately 17 months in which to consider the agreements. The plaintiffs admit that, during this time, they considered alternatives to signing the agreements, including the alternatives of litigation and bankruptcy. They also admit that they rejected these alternatives in favor of signing the agreements "because they wanted to work things out with Shoney's and keep their Greenfield franchise." *See* plaintiffs' response (Docket Entry No. 105), ¶ 166. Finally, the plaintiffs acted with the advice of counsel when they signed the agreements. In addition to these facts, the plaintiffs have not asserted any acts on the part of the defendant that constitute duress.

Based on the decisions in *Davenport* and *Ramsey* and the circumstances under which the plaintiffs signed the agreements, the Court affirms the conclusion of the Magistrate Judge that the plaintiffs were not under economic duress at the time they entered into the termination, reinstatement and forbearance agreements.

The plaintiffs also assert that the agreements were invalid because the execution of the agreements was fraudulently induced, as the plaintiffs did not know

about the claims they were waiving against the defendant. The Magistrate Judge determined that the plaintiffs did not sign the releases as the result of fraud because they had knowledge that other franchisees had brought similar claims against Shoney's and the plaintiffs were aware of their potential claims against the defendant when they signed the agreements. The plaintiffs object to this determination and contend that they did not know of their potential claims against the defendant because they did not believe the allegations of the other franchisees.

In reaching the conclusion that the execution of the agreements was not fraudulently induced, the Magistrate Judge relied on the plaintiffs' admission that on July 6, 1996, Mr. Kinnard was told by another franchisee, Ms. Daushca, that the defendant was violating Indiana franchise laws because the prices of the Commissary were increased to obtain greater profits. Additionally, the Magistrate Judge relied on the plaintiffs' admission that Mr. Kinnard was told about a lawsuit filed by Shoney's franchisees Steve Sanders and Ron Cook in January of 1995, and that the plaintiffs were asked to participate. The suit was against Shoney's and involved claims regarding the Commissary purchases and contributions to and the operations of the co-op advertising program.

The Court agrees with the Magistrate Judge that, even if the plaintiffs did not think the other franchisees' claims against the defendant were well founded, the plaintiffs were nevertheless on notice of their potential claims against the defendant at the time the agreements were executed. The Court therefore affirms the decision of the Magistrate Judge, granting summary judgment to the defendant with respect to the plaintiffs' claim that the termination, reinstatement and forbearance agreements were executed as the result of fraud.

**12.** The defendant does not assert that the agreements release Mr. Kinnard's claims un-

Accordingly, the Court finds that the termination, reinstatement and forbearance agreements containing releases of liability were not procured through either duress or fraud. The Court shall adopt the recommendation of the Magistrate Judge that the defendant's motion for summary judgment be granted with respect to the plaintiffs' claims relating to the licensing agreements that arose prior to October 30, 1996.[12]

### 1. misappropriation of advertising funds

The plaintiffs claim that Shoney's breached the licensing agreements and committed conversion by misappropriating advertising funds. The plaintiffs admit that they have not contributed to the advertising fund since 1995, and accordingly, the Magistrate Judge determined that the plaintiffs' claim is barred by the releases. The plaintiffs object on the basis that the releases are invalid. As the Court agrees with the conclusion of the Magistrate Judge and has determined that the releases are valid, the defendant's motion for summary judgment will be granted with respect to these claims.

### 2. failure to maintain standards in restaurants

█ The plaintiffs contend that the defendant breached the licensing agreements by failing to maintain its company-owned stores according to the standards set forth in the licensing agreements and failing to require all franchisees to maintain such standards, thereby causing harm to Shoney's reputation.

Relying on this Court's determination in *Shoney's v. Morris,* No. 3–98–0002 (M.D.Tenn.1999) that the defendant was not under a contractual obligation to maintain the quality of its company-owned stores, the Magistrate Judge concluded that Shoney's was not under any obligation to maintain the quality of its company-

der the joint operating agreement.

owned stores. The plaintiffs object on two grounds.

First, the plaintiffs object to the findings of the Magistrate Judge on the basis that his decision is tantamount to a finding of issue preclusion based on the Court's earlier decision in *Morris*. The plaintiffs assert that issue preclusion is not available in these circumstances because the plaintiffs were not parties in *Morris*. The defendant argues that the Magistrate Judge did not make his determination based on issue preclusion, but that the Magistrate Judge was following a precedent set in the *Morris* case.

Next, the plaintiffs object to the recommendation of the Magistrate Judge that summary judgment be granted because he did not address whether the licensing agreements required the defendant to force other franchisees to maintain their restaurants according to certain standards and, if so, whether the defendant breached the licensing agreements in this respect.

In *Morris*, a franchisee sued Shoney's for breach of contract, claiming that Shoney's was contractually obligated under their franchise agreement to maintain certain standards in its company-owned stores and that it failed to maintain such standards. In granting Shoney's motion for summary judgment, the Court found that the plaintiff had not established that the franchise agreement obligated Shoney's to maintain such standards. The defendant raises the same grounds for summary judgment with respect to the plaintiffs' claims in this case.

The first page of the licencing agreements between Shoney's and the plaintiffs in this case states:

> WHEREAS, Shoney's restaurants and the products sold therein have a reputation for excellence that has been acquired and is being maintained by continuing research and advertising programs and by requiring all parties licensed to use the Shoney's System to maintain high standards of quality and service.

Defendant's response (filed May 14, 1999; Docket Entry No. 115), ¶ 52–53. The plaintiffs contend that the last portion of this statement, starting with the words "requiring all parties licensed" obligates Shoney's to ensure that all licensed Shoney's franchisees maintain their restaurants according to certain standards. The plaintiffs also rely on a portion of the licensing agreements which states that Shoney's has the right to inspect the franchises to determine whether the restaurants are in compliance with Shoney's standards and to take steps to cure any problems if the licensee does not take such steps after being put on notice that its restaurant is not in compliance. *Id.* The plaintiffs contend that this also creates an obligation on the part of Shoney's to ensure that franchisees meet Shoney's standards.

Considering the language in the licensing agreements in the light most favorable to the plaintiffs, the Court finds that the plaintiffs have not established a genuine issue of material fact that either of these provisions create an obligation on the part of Shoney's to maintain certain standards. The former provision states that Shoney's requires licensees to use the Shoney's system. The latter gives Shoney's the right to inspect and take steps to ensure compliance. Neither create an obligation on the part of Shoney's to maintain its restaurants according to certain standards or to ensure that the other franchises are maintained according to such standards. Accordingly, the Court agrees with the Magistrate Judge that the defendant is entitled to summary judgment with respect to the plaintiffs' claim that Shoney's breached the licensing agreements by failing to ensure that company-owned restaurants and other franchisees met certain standards.

### D. *Indiana Deceptive Franchise Practice Act*

#### 1. § 23–2–2.7–2(1)(iii)

The plaintiffs assert that the defendant required them to pay more in advertising

fees than is provided in the licensing agreements in violation of Indiana Code § 23–2–2.7–2(1)(iii). This section states in pertinent part:

It is unlawful for any franchisor who has entered into any franchise agreement with a franchisee ... to engage in any of the following acts or practices in relation to the agreement:

. . . .

(iii) participate in an advertising campaign or contest, any promotional campaign, promotional materials, display decorations, or materials at an expense to the franchisee over and above the maximum percentage of gross monthly sales or the maximum absolute sum required to be spent by the franchisee provided for in the franchise agreement; in the absence of such provision for required advertising expenditures in the franchise agreement, no such participation may be required;

Ind.Code § 23–2–2.7–2(1)(iii).

The licensing agreements state that the plaintiffs were required to pay Shoney's two percent of their gross monthly sales for advertising. The Magistrate Judge found that the defendant is entitled to summary judgement with respect to the plaintiffs' claims under Indiana Code § 23–2–2.7–2(1)(iii) because the plaintiffs failed to present any evidence that they paid more in advertising than was required by the licensing agreements. The plaintiffs contend that they did not present this evidence because they were not permitted a full opportunity to conduct discovery.

The Court agrees with the Magistrate Judge that the plaintiffs have not presented any evidence to support their claim under Indiana Code § 23–2–2.7–2(1)(iii). As the Court has determined that the plaintiffs were given ample time to conduct discovery and that the plaintiffs shall not be granted any additional opportunity for discovery, the Court shall affirm the recommendation of the Magistrate Judge and grant the defendant's motion for summary judgment with respect to this claim.

### 2.  § 23–2–2.7–2(5)

#### a.  *Shoney's purchases of franchises*

The plaintiffs contend that the defendant discriminated against them in violation of Indiana Code § 23–2–2.7–2(5) by refusing to purchase their restaurants but agreeing to purchase the restaurants of other franchisees. Indiana Code § 23–2–2.7–2(5) states that "[i]t is unlawful for any franchisor who has entered into any franchise agreement with a franchisee ... to engage in any of the following acts and practices in relation to the agreement ... (5) Discriminating unfairly among its franchisees."

■■■■■■ In order to establish a prima facie case under this section of the Indiana Deceptive Franchise Practices Act, the plaintiffs must establish that "as between two or more similarly situated franchisees, and under similar financial and marketing conditions, a franchisor engaged in less favorable treatment toward the [plaintiff] than toward other franchisees. Thus, proof of 'discrimination' requires a showing of arbitrary disparate treatment among similarly situated individuals or entities." *Canada Dry Corp. v. Nehi Beverage Co., Inc.,* 723 F.2d 512, 521 (7th Cir.1983). The burden of proof with respect to establishing discrimination under this section has been analogized to the burden of proof under the framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677 (1973), for deciding employment discrimination cases. *Ford Motor Credit Co. v. Garner,* 688 F.Supp. 435, 445 (N.D.Ind.1988) (citing *Reeder–Baker v. Lincoln Nat. Corp.,* 649 F.Supp. 647 (N.D.Ind.1986), *aff'd* 834 F.2d 1373 (7th Cir.1987) and *Beard v. Whitley County REMC,* 656 F.Supp. 1461 (N.D.Ind.1987), *aff'd* 840 F.2d 405 (7th Cir.1988)). Under the *McDonnell Douglas* framework:

If a prima facie case of discrimination is proved by the plaintiff, then the burden of production shifts to the defendant to

offer a legitimate non-discriminatory reason for its action-that is, that it did what it did for some legitimate (i.e.non-race, non-sex, non-retaliatory) reason. It matters not what the reason is so long as it is non-discriminatory. Thus, even bad reasons are good enough, so long as they are non-discriminatory. If the prima facie case is rebutted, then the plaintiff has to prove that the proffered reason is pretextual, that a discrimination [sic] reason more likely motivated the employer.

*Id.*

The plaintiffs alleged that the defendant purchased several franchises of Mr. Bob Langford that were similarly situated to theirs in that the franchises purchased were in financial trouble. The record reflects that the defendant purchased several franchises of Mr. Langford and that Mr. Langford was subsequently hired by Shoney's. Shoney's contends that it purchased Mr. Langford's franchises so that his ownership would not cause a conflict of interest with his employment. Consequently, Shoney's asserts that the plaintiffs' prima facie case of discrimination can not be based on the purchase of Mr. Langford's restaurants because he was not similarly situated to the plaintiffs. It also contends that even if the plaintiffs establish their prima facie case of discrimination, they cannot maintain their claim because the defendant has asserted a non-discriminatory reason for the purchase.

The Magistrate Judge agreed with the defendant's contention that the plaintiffs had not established discrimination under § 23–2–2.7–2(5) because the plaintiffs were not similarly situated to Mr. Langford. The plaintiffs object, stating that Shoney's did not purchase his store to avoid a conflict of interest, but that "[i]t is more likely that the Defendant harbored a continuing favoritism toward Langford which resulted in his ultimate employment by Shoney's." Plaintiffs' memorandum (Docket Entry No. 134) at 29.

The plaintiffs have presented no evidence to support their objection to the recommendation of the Magistrate Judge. Even though Mr. Langford may be similarly situated to the plaintiffs in some respects, it is undisputed that he was not similarly situated to them in that Mr. Langford went to work for Shoney's shortly after it purchased Mr. Langford's franchises. Accordingly, the Court finds that the plaintiffs have not established a genuine issue of material fact with respect to their prima facie case of discrimination under Indiana Code § 23–2–2.7–2(5) based on Shoney's purchase of Mr. Langford's restaurants and affirms the recommendation of the Magistrate Judge that the defendant's motion for summary judgment be granted with respect to this claim.

### b. *uniform delivery fee*

The plaintiffs also contend that the defendant discriminated against them by charging them the same delivery fees from the Commissary as it charged other franchises, even though the distance to deliver to the plaintiffs' restaurants was less than the distance to deliver to some of the other franchises' restaurants.

As the Magistrate Judge noted, the plaintiffs did not include this claim in their first amended complaint, but raised it for the first time in their response to the defendant's motion for summary judgment. *See* first amended complaint (filed October 5, 1998; Docket Entry No. 57) at 10–11; plaintiffs' response and memorandum (filed April 26, 1999; Docket Entry No. 103) at 19. Consequently, the Court finds that this claim was not properly raised under Rule 8(a)(2) of the Federal Rules of Civil Procedure and affirms the determination of the Magistrate Judge that the defendant is entitled to summary judgment with respect to this claim.

### 3. *§ 23–2–2.7–2(6)*

The plaintiffs contend that the defendant committed trover and conversion, breach of fiduciary duty and a violation of the Indiana Deceptive Franchise Practice

Act, Indiana Code § 23–2–2.7–2(6), because manufacturers paid Shoney's rebates for purchases made by franchisees at the Commissary, and the defendant failed to credit the plaintiffs' account for the funds received.

It is undisputed that Shoney's did not pay the plaintiffs or credit the plaintiffs or other franchisees for these rebates based on the amount of goods the franchisees purchased from the Commissary.

Section 23–2–2.7–2(6) of the Indiana Deceptive Franchise Practice Act states:

It is unlawful for any franchisor who has entered into any franchise agreement with a franchisee who is either a resident of Indiana or a nonresident operating a franchise in Indiana to engage in any of the following acts and practices in relation to the agreement:

. . . .

(6) Obtaining money, goods, services, or any other benefit from any other person with whom the franchisee does business, on account of, or in relation to, the transaction between the franchisee and the other person, other than compensation for services rendered by the franchisor, unless the benefit is promptly accounted for, and transmitted to the franchisee.

Indiana Code § 23–2–2.7–2(6).

Noting that § 23–2–2.7–2(6) requires that a franchisor account for the benefits it receives and transmit them to the franchisees based on a transaction " 'between the franchisee and the [other] person,' " the Magistrate Judge found that Shoney's was not required to account for the rebates it received because Shoney's received rebates from manufacturers based upon purchases made from the manufacturers by the Commissary, not purchases made from the Commissary by the franchisees. Report and Recommendation (Docket Entry No. 126) at 76. The Magistrate Judge stated "[h]ere, the firms' rebates to Shoney's are premised upon the Commissary's purchases, not franchisees' sales." Conse-

quently, the Magistrate Judge concluded that the defendant had not violated Indiana Code § 23–2–2.7–2(6) by failing to credit the plaintiffs for rebates.

The plaintiffs object to the conclusion of the Magistrate Judge. They contend that the rebates fall within the purview of the statute because the defendant received rebates "on account of or in relation to the transactions between Plaintiffs and Commissary Operation, Inc." Plaintiffs' memorandum (Docket Entry No. 134) at 34.

The Court agrees with the Magistrate Judge that the language in § 23–2–2.7–2(6) requires accounting only for benefits or money received by the franchisor from third persons based on purchases by franchisees from persons other than the franchisor. In this case, the rebates Shoney's received were the direct result of transactions between the manufacturers and the Commissary, not between the franchisees and the Commissary or the franchisees and the manufacturer. Therefore, the rebates do not fit under the purview of the statute. Accordingly, the Court affirms the conclusion of the Magistrate Judge and shall grant the defendant's motion for summary judgment as to the plaintiffs' claim that the defendant violated § 23–2–2.7–2(6) by not accounting for rebates or crediting the franchisees for rebates received from manufacturers based on sales made by the Commissary.

■■■ As to the plaintiffs' claim of conversion, under Tennessee law, " '[a] conversion, in the sense of the law of trover is the appropriation of the thing to the party's own use and benefit, by the exercise of dominion over it, in defiance of the plaintiff's rights.' " *Mammoth Cave Prod. Credit Ass'n v. Oldham,* 569 S.W.2d 833, 836 (Tenn.App.1977) (quoting *Barger v. Webb,* 391 S.W.2d 664, 665 (1965)); *see also Paehler v. Union Planters Nat. Bank, Inc.,* 971 S.W.2d 393, 398 (Tenn.App.1997). In order to establish conversion, the plaintiffs must show that "the defendant ... had an intent to exercise dominion and control over the property that is in fact

inconsistent with the plaintiff[s'] rights, and [did] so." *Id.*

As the Court has determined that the plaintiffs did not have any property interest in the rebates given to Shoney's by the manufacturers, as a matter of law, the plaintiffs cannot establish conversion. Accordingly, the Court affirms the determination of the Magistrate Judge with respect to the plaintiffs' claim of trover and conversion and will grant the defendant's motion for summary judgment as it relates to this claim. In addition, as the Court finds that there is no genuine issue of material fact with respect to the plaintiffs' contention that the defendant was obligated to credit the plaintiffs' account for rebates, it cannot support the plaintiffs' claim of breach of fiduciary duty. The Court therefore, also affirms the determination of the Magistrate Judge with respect to these claims and will grant the defendant's motion for summary judgment as it relates to them.

### E. Defendant's alleged failure to disclose the Commissary's profits

The plaintiffs contend that the defendant failed to disclose to the plaintiffs that the Commissary made a profit from goods sold to the plaintiffs, thereby breaching the licensing agreements and the Indiana Disclosure Act, Indiana Code § 23–2–2.5. The defendant moved for summary judgment as to these claims on the basis that they had been waived, released, are barred by the statute of limitations and are not supported by the facts.

The licensing agreements at issue in this case provided that franchisees could purchase food products from Shoney's Commissary. It is undisputed that products sold by the Commissary were marked up and the Commissary earned a small profit from its sales. In fiscal years 1984 to 1998, the Commissary made a profit before taxes, interest or reserve from bad debts ranging from 1.56 percent to 2.31 percent.

The plaintiffs claim that the defendant told them that there would be no franchise fees beyond those disclosed in the franchise agreements and the uniform franchise offering circular but collected hidden franchise fees from the plaintiffs through the sale of goods by the Commissary in violation of the Indiana Franchise Disclosure Act.

The Indiana Franchise Disclosure Act provides that in order to offer to sell a franchise, the franchisor must provide the prospective franchisee a disclosure statement containing, among other things:

> (k) a description of all other franchise fees to be paid by the franchisee and a statement describing any payments or fees other than franchise fees that the franchisee is required to pay to the franchisor or its affiliates, including payment of fees which the franchisor collects in whole or in part on behalf of a third party or parties;

Ind.Code § 23–2–2.5–10; *see also,* Ind. Code §§ 23–2–2.5–9, 23–2–2.5–13. A franchise fee is defined as:

> any fee that a franchisee is *required* to pay directly or indirectly for the right to conduct a business to sell, resell, or distribute goods, services or franchises under a contract agreement, including, but not limited to, any such payment for goods or services. "Franchise fee" does not include:
>
> . . . .
>
> (3) the purchase or agreement to purchase goods at a bona fide wholesale price.

Ind.Code § 23–2–2.5–1(i)(emphasis added).

The Magistrate Judge determined that the plaintiffs' claim under the Indiana Franchise Disclosure Act is time-barred under a two-year statute of limitations. The plaintiffs object to the conclusion of the Magistrate Judge that a two-year statute of limitations, rather than a three-year limitations period, is applicable to claims under the Indiana Franchise Disclosure Act. The defendant concedes that the Mag-

istrate Judge was mistaken in finding a two-year period applicable rather than a three-year period. Nevertheless, the defendant asserts that the plaintiffs' claim is barred under the statute of limitations because Mr. Kinnard should have known of the plaintiffs' claims under the Disclosure Act by 1991 when he received a uniform franchise offering circular.

The statute of limitations for the Indiana Franchise Disclosure Act is set forth in Indiana Code § 23–2–2.5–30 as follows: "[a] person may not maintain an action to enforce any liability created under this chapter unless brought before the expiration to three (3) years after discovery by the plaintiff of the facts constituting the violation." Accordingly, the Court finds that the statute of limitations for claims brought under the Indiana Franchise Disclosure Act is three years.

It is undisputed that Mr. Kinnard signed receipts acknowledging delivery to him of a uniform franchise offering circular on March 15, 1991. Item 9 of the Indiana version of the 1991 Shoney's uniform franchise offering circular states:

> D. Neither Franchisor nor its affiliates derive revenues as a result of required purchases by franchisees in accordance with the specifications and standards except when such purchases are made directly from Franchisor or its affiliates.

Plaintiffs' response (Docket Entry No. 105), ¶ 47.[13] The plaintiffs filed their lawsuit in June of 1997, more than six years after receipt of this information. Therefore, the Court finds that Mr. Kinnard was on notice of the plaintiffs' claim more than three years prior to the filing of this cause of action on June 26, 1997.

Nevertheless, the plaintiffs contend that their claim is not barred by the statute of limitations because neither Mrs. Kinnard nor Ms. Cox received the UFOCs and were not aware of the defendant's alleged wrongful conduct in 1991 when the UFOC

was provided to Mr. Kinnard. The defendant argues that, pursuant to Indiana Code §§ 23–2–2.5–1(g) and 23–2–2.5–4, no disclosure was required to be made to Mrs. Kinnard and Ms. Cox at the time of the assignment.

Indiana Code § 23–2–2.5–4 states that "[t]he offer of sale of a franchise by a franchisee who is not an affiliate of the franchisor for his own account is exempt from [the disclosure requirements] if the offer or sale is not effected by or through a franchisor." Based on this language in the statute, the Court finds that the defendant was exempt from the disclosure requirements with respect to Mrs. Kinnard and Ms. Cox. Accordingly, Court affirms the conclusion of the Magistrate Judge that the plaintiffs' claim under the Indiana Franchise Disclosure Act is time-barred and shall grant the defendant's motion for summary judgment with respect to this claim.

### F. Joint Ownership Plan

Mr. Kinnard entered into the group joint venture agreement for Shoney's Ownership Plan 1977 on July 18, 1977. Shoney's was to be the representative of the group of joint venturers and to manage the joint venture. Mr. Kinnard now contends that Shoney's breached its fiduciary duty to him as a member of the joint venture by: (1) failing to maintain certain of the plan documents; (2) misappropriating fees and charging the ownership plan restaurants excessive fees; and (3) adding new restaurants to the ownership plan at the expense of the plan in order to offset its own losses.

#### 1. failure to maintain and provide documents

█ The private placement offering circular for the 1977 ownership plan, stated, in part, "Shoney's Ownership Plan 1977 ('the Group') is a joint venture to be

---

**13.** The record further reflects that Mr. Kinnard failed to read any of the UFOCs that were provided to him until after he filed this lawsuit. Plaintiffs' response (Docket Entry No. 105), ¶ 44.

formed under the laws of the State of Tennessee by Shoney's, Inc." Plaintiffs' response (Docket Entry No. 105), ¶ 205. "A joint venture is governed by the rules applicable to a partnership." *Federated Stores Realty, Inc. v. Huddleston,* 852 S.W.2d 206, 212 (Tenn.1992) (citing *Garland v. Seaboard Coastline R.R. Co.,* 658 S.W.2d 528, 534 (Tenn.1983) and *Garner v. Maxwell,* 50 Tenn.App. 157, 360 S.W.2d 64 (1962)). In accordance with Tennessee law, the Magistrate Judge concluded that the joint venture was governed by Tennessee's laws regarding partnerships, including the duty upon a partner to act as a fiduciary and in good faith when dealing with one another. Report and Recommendation (Docket Entry No. 126), 78 (citing *Lightfoot v. Hardaway,* 751 S.W.2d 844, 849 (Tenn.Ct.App.1988)). The Magistrate Judge also concluded that Tennessee's Uniform Partnership Act, Tennessee Code Annotated, § 61–1–101 *et seq.* governed the joint venture. As the Magistrate Judge concluded, the Uniform Partnership Act requires that "the partnership books shall be kept subject to any agreement between the partners, at the principal place of business of the partnership, and every partner shall at all times have access to and may inspect and copy any of them." Tenn.Code Ann. § 61–1–118. It is undisputed that the joint venture agreement provided that Shoney's "shall provide office space and storage space as necessary for the business records of the Group." Plaintiffs' response (Docket Entry No. 105), ¶ 207.

The joint venture agreement, section 4, states that:

> The operation of the individual restaurants shall be governed by the terms of an Agreement between Shoney's and the

Group, a copy of which Agreement will be furnished to any Member of the Group upon request.

Shoney's response (Docket Entry No. 115), ¶ 73.

Shoney's has been unable to find the executed operating agreement. In an attempt to establish the terms of the agreement, Shoney's has produced an unsigned copy of an agreement which it contends is a copy of the ownership plan. Additionally, Shoney's has been unable to locate and produce financial statements for the joint venture for 1977 and 1978. Mr. Kinnard contends that, by failing to maintain these documents, the defendant has breached its fiduciary duty to him. He also contends that the defendant's failure to maintain and provide the documents constitutes bad faith.[14]

The Magistrate Judge concluded that "[t]here are no facts to suggest any lack of good faith in Shoney's maintenance of the venture's records for this nine franchise system of twenty-two years, by the absence of a signature page and two financial statements that are twenty years old." Report and Recommendation (Docket Entry No. 126) at 79. Accordingly, the Magistrate Judge recommended that the Court grant the defendant's motion for summary judgment with respect to the claim that the defendant's failure to maintain the documents constitutes bad faith.

Mr. Kinnard objects and contends that the fact that the joint venture agreement is missing is affirmative evidence of the defendant's lack of good faith and breach of fiduciary duty. Mr. Kinnard, however, has not presented any authority for this conclusion, nor can the Court find any. Additionally, he has not presented any evidence that Shoney's failed to exercise good

---

**14.** The Magistrate Judge found that Mr. Kinnard does not dispute that the language contained in the unexecuted agreement was the language of the executed operating agreement for the joint venture. Report and Recommendation (Docket Entry No. 126) at 79. However, Mr. Kinnard objects, stating that he does dispute whether the unexecuted agreement

contains the same provisions as the lost executed operating agreement. *See* plaintiffs' response (Docket Entry No. 105), ¶ 108. Accordingly, the Court finds that the Magistrate Judge was mistaken in his conclusion that Mr. Kinnard does not contest these provisions.

faith with respect to its duty to him, and the Court agrees with the Magistrate Judge that Mr. Kinnard has not raised a genuine issue of material fact with respect to the claim that the defendant breached its fiduciary duty or duty of good faith and fair dealing by not maintaining all the records of the joint venture. Accordingly, the Court shall grant the defendant's motion for summary judgment with respect to this claim.

### 2. misallocation of expenses and excessive fees

Mr. Kinnard further contends that Shoney's breached its fiduciary duty to him because it failed to equitably allocate expenses between the joint venture restaurants and company-owned restaurants. Specifically, Mr. Kinnard contends that "Shoney's has charged the Joint Venture management fees in excess of those reasonable fees permitted by the Joint Venture Agreement," and that it increased the expenses of the joint venture restaurants but not the expenses of the company-owned restaurants. First amended complaint (Docket Entry No. 57), ¶ 91. Mr. Kinnard further asserts that "[t]he inequitable application of franchise fees which exceed those being paid by other Company-owned stores not only directly reduces the profits of each store in the Joint Venture, but all such profits diverted are paid directly to the Company." Plaintiffs' response and memorandum (Docket Entry No. 103), ¶ 25. Specifically, the plaintiff contends that the defendant improperly charged a two percent franchise fee and

six percent rent to the ownership plan restaurants while charging the company-owned restaurants less.

In support of its motion for summary judgment on this issue, the defendant presented the supplemental declaration of Mr. Lonnie Daniel, who is responsible for the administration of the joint ownership plan. In his declaration, Mr. Daniel stated:

[f]rom time to time, Shoney's, Inc. has changed the name of the line items on the Income Statement chart of accounts. The change in a line item name from one year to the next does not indicate that a new source of income or a new expense has been added. Most frequently, any change in a line item name for an expense is because that expense previously was included in a more general category and it was later broken out of that category into one more specific. Sometimes such changes in line item names also work in the reverse, with several specific expenses being compiled into a more general category.... None of the line item name changes identified [by the plaintiff] added new expenses to the Ownership Plan restaurants.

Supplemental declaration of Lonnie Daniel (filed May 14, 1999; Docket Entry No. 117) at 2–3.[15]

The defendant further presented the declaration of Mr. Taylor Henry, Jr., who was the chief financial officer of Shoney's from 1974 to 1991, senior vice president of finance from 1991 to 1992, and chairman of the board and chief executive officer of

---

15. Mr. Kinnard contends that the following additional expense categories were charged to the joint venture:

    (A) Half free food was allocated to the joint venture stores beginning in 1996;
    (B) Trainee Labor was allocated to the joint venture stores beginning in 1989;
    (C) Repair and Maintenance Department was added in 1994;
    (D) Shoppers were added beginning in 1996;
    (E) Theft losses were added in 1986;
    (F) Bank Services Charges were added in 1996;

    (G) Outdoor (Billboard) Advertising was added in 1997;
    (H) Vendor Advertising was added in 1996;
    (I) Legal fees were added in 1996;
    (J) Regional Allocation was added in 1996;
    (K) Area Director Allocation was added in 1996; and
    (L) A Divisional Bonus expense category was added in 1988 and eliminated in 1995.
Plaintiffs' response and memorandum in opposition to defendant's motion for summary judgment (Docket Entry No. 103) at 25–26.

Shoney's beginning in 1992. Mr. Taylor stated that:

> nine Shoney's restaurants which were a part of the 1977 Ownership Plan were charged the same categories of expenses, determined by the same method, as all other Shoney's restaurants, except in two respects-rent and franchise fees. These two differences resulted from Company practices in effect when the 1977 Ownership Plan was established, and the pricing of the investment and anticipated return on the investment was based on those practices.

Declaration of Taylor Henry Jr. (filed April 2, 1999; Docket Entry No. 83) at 3. The Magistrate Judge found that "[t]he allocations to Ownership Plan restaurants were established at the inception of the Ownership Plan, and with only a few minor exceptions, Shoney's has consistently followed that established practice. Kinnard's only dispute is not factual, but is rather a contention that the practice is 'illogical.' This contention is not sufficient to create a factual issue to defeat summary judgment." Report and recommendation (Docket Entry No. 124) at 18–19.

Mr. Kinnard objects to the conclusion of the Magistrate Judge, asserting that the "[d]efendant has failed to provide any documentation which proves that Shoney's has the right to assess any fees differently to Ownership Plan stores than to company stores." Plaintiffs' memorandum (Docket Entry No. 134) at 39.

Mr. Kinnard contends that:

> The supplemental declaration of Lonnie Daniel attempts to cloud the issue of increasing expenses allocated to the Joint Venture stores by alleging that the changes were simply to the names of the line items in question. However, a simple allocation change does not explain the overall increase in operating expenses charged to the Joint Venture states as a percentage of gross income in each of the years these changes took place.

Plaintiffs' memorandum (Docket Entry No. 134) at 38.

Mr. Kinnard presented the declaration of his attorney, Arthur S. Robinson, and the attachments to his declaration as establishing that expenses charged to the joint venture stores have increased as a percentage of gross sales since 1977. The defendant contends that this declaration does not raise a genuine issue of material fact with respect to Mr. Kinnard's claim because it does not show a comparison of expenses to the company-owned stores.

Upon review of the record, the Court finds that Mr. Kinnard has not presented any affirmative evidence that the defendant breached its fiduciary duty to the joint venture by charging the joint venture restaurants rent and franchisees fees in excess of those charged to the company-owned restaurants. Moreover, Mr. Kinnard has not presented any affirmative evidence that the expenses of the joint venture restaurants were increased more than those of the company-owned restaurants. Accordingly, the Court affirms the determination of the Magistrate Judge and shall grant the defendant's motion for summary judgment with respect to this claim.

### 3. shift of unprofitable restaurants to joint venture

Next, Mr. Kinnard contends that Shoney's breached its fiduciary duty by shifting the ownership of several restaurants that were losing money from Shoney's to the joint venture. The Magistrate Judge found that no new restaurants had been added to the ownership plan since its inception and recommended that the defendant's motion for summary judgment be granted with respect to this claim. Mr. Kinnard objects, stating that three new restaurants have been added to the joint venture.

The record reflects that three of the nine restaurants in the ownership plan, one located in Muscle Shoals, Alabama, one located in Tullahoma, Tennessee, and

one located in Hinesville, Georgia, were replaced with restaurants at different locations after the inception of the plan in 1977. Specifically, it is undisputed that "[t]he Muscle Shoals unit was replaced in January 1996, the Tullahoma unit in May 1996, and the Hinesville unit in February 1998. All three of these restaurants are new locations in the same areas as the replaced stores." Plaintiffs' response (Docket Entry No. 103), ¶ 212.

These were, therefore, new restaurants in that they were new locations. However, there is no evidence that they were moved from Shoney's ownership to the ownership joint venture. Instead, they merely replaced those which were already in the ownership plan. Moreover, Mr. Kinnard has not presented any evidence to raise a genuine issue of material fact that the defendant replaced these restaurants in order to shift losses from it to the ownership plan. Accordingly, the Court finds that the defendant is entitled to summary judgment with respect to the claim of breach of fiduciary duty based on changes to these three ownership plan restaurants.

### G. Counterclaim

The defendant contends that the plaintiffs failed to pay the balance of their past due franchise and advertising fees in accordance with the forbearance agreement the parties entered into on the October 30, 1996. The defendant, therefore, moved for summary judgment with respect to these fees, and also requested reasonable attorney's fees and expenses incurred in enforcing the forbearance agreement and defending this lawsuit.

The Magistrate Judge granted the defendant's motion with respect to its counterclaim. The Magistrate Judge found that there is a deficiency in the plaintiffs' payments to the defendant under the forbearance agreement in the amount of $88,066.17 and $186.78 in interest as of March 26, 1999. The plaintiffs object to the conclusion of the Magistrate Judge on the basis that the termination, reinstatement and forbearance agreements were obtained under economic duress and that they are entitled to funds misappropriated by the defendant.

As the Court has determined that the October 30, 1996, termination, reinstatement and forbearance agreements were valid and that the defendant is entitled to summary judgment with respect to the plaintiffs' claims that it misappropriated funds, the Court finds that the defendant is entitled to payment under the forbearance agreement. Accordingly, the Court affirms the determination of the Magistrate Judge and shall grant the defendant's motion for summary judgment with respect to the counterclaim.

An appropriate order shall be entered.

### ORDER

In accordance with the memorandum contemporaneously entered, the Court has independently reviewed the Report and Recommendation of the Magistrate Judge (entered June 22, 1999; Docket Entry No. 126) the plaintiffs' objections (filed July 26, 1999; Docket Entry No. 129), defendant's reply (filed August 24, 1999; Docket Entry No. 139) and the entire record. The Court finds the plaintiffs' objections to be without merit with two exceptions.[1] The Report and Recommendation of the Magistrate Judge is adopted and approved.

Accordingly, the defendant's motion (filed April 2, 1999; Docket Entry No. 73) for summary judgment is granted. The plaintiffs' action is dismissed with prejudice. The defendant's motion for summary judgment with respect to its counterclaim is granted. The defendant shall have and recover from the plaintiffs the sum of $88,252.95. The defendant is al-

---

1. The plaintiffs' objections as to a stay of discovery and as to the dispute over the language in the unexecuted copy of the owner-ship plan are well taken but are not material to the disposition of this action.

lowed its reasonable attorney fees and costs.[2]

The entry of this order shall constitute the judgment in this action.

It is so ORDERED.

---

**2.** The application for attorney fees shall be made in accordance with the Local Rules of

